51 So.2d 804

Succession of ONORATC.

No. 39781.

March 19, 1951.

2

Monroe & Lemann, J. Blanc Monroe and Walter J. Suthon, Jr., all of New Orleans, for opponents and appellants Marie Lydia Reichard, Marie Therese Reichard, and Maurice Charles Jules Reichard.

Oliver S. Livaudais, New Orleans, for opponent and appellant Mrs. Marie Odile Reichard Fournoraux.

Edward Rightor, New Orleans, for appellees.

HAWTHORNE, Justice.

To the final account filed by the testamentary executors in the succession of Joseph L. Onorato, certain individuals, residents of Europe, whom we shall hereafter designate as the Reichard heirs, filed opposition. The case was submitted in the lower court on a stipulation of facts, and judgment was rendered therein, recognizing opponents to be creditors of the succession and increasing the amount due them from $25,468.52, as shown on the final account, to $31,794.84, and further ordering

the opponents to be paid, out of life insurance proceeds amounting to $12,690.75 realized from policies made payable to the executors of the deceased, the sum of $4283.08, representing a proportion of the premiums. The executors in their final account proposed to pay the proceeds in their entirety to the widow and the sister of the decedent under his last will in which they were named as universal legatees. As thus amended the final account of the executors was approved and homologated, and the fund ordered distributed in accordance therewith.

The Reichard heirs have appealed to this court, seeking to have the judgment amended so as to award to them the entire proceeds of the insurance policies, or so as to increase the award to $5328.86, the aggregate amount of certain premium payments made on these policies by the deceased, or, in any event, to have the judgment of the lower court affirmed. Appellees have answered the appeal, praying that the judgment of the district court be reversed insofar as it awarded any portion of the insurance proceeds to the opponents.

From June, 1939, until his death on July 29, 1942, Joseph L. Onorato was employed by, and acted as agent of, the Reichard heirs in the management, administration, and collection of rents from certain properties owned by them in the City of New Orleans. For most of this time the opponents were out of communication with their agent due to conditions prevailing during World War II, since they were residents of that part of Europe occupied by the German forces and he was a resident of this country. During this period the deceased, in breach of his duty and obligations as their agent, appropriated to his own use and benefit more than $26,000 of the funds belonging to the opponents. He also used for his own purposes sums in excess of $6000 belonging to local persons for whom he acted as real estate agent, but this amount has been paid since his death by his widow and his sister. His widow and his sister, however, were not parties to his fraud, and there has been no reflection on their character.

The succession of the decedent is hopelessly insolvent. He left eight insurance policies payable to his executors for an amount aggregating $110,000, which, after payment of outstanding indebtedness due thereon as a result of assignments, pledges, and money owed the insurers, produced the net amount of $12,690.75, which is the sum here in controversy and which the executors proposed to pay to his widow and his sister. He had other insurance policies payable to designated beneficiaries, his wife and his sister, aggregating approximately $80,000, and these policies after payment of outstanding indebtedness due thereon produced a net amount of $28,354.84, which has been paid directly to the designated beneficiaries.

The deceased, Joseph L. Onorato, used the same bank accounts for his personal,

business, and fiduciary funds, and during the time he was acting as agent of the Reichard heirs deposited therein a sum in excess of $300,000, commingling the funds belonging to the Reichard heirs with other funds received by him. At the time of his death, Onorato had to his credit in his bank accounts less than $2000, almost all of which was applied by the banks on indebtedness to them by Onorato. The total of all premiums paid by the deceased on the policies of insurance payable to his executors was over $97,000, but during the period of gestion as appellants' agent the premiums actually paid on these policies were in excess of $10,000. *Of this amount the sum of $5328.86 was paid with money drawn from the general bank accounts of decedent,* and the rest paid with money borrowed by him. His personal expenditures, including premium and loan payments on his life insurance policies, during the period of his gestion as a real estate agent for the Reichard heirs exceeded the net profits received by him from his business by more than $25,000.

On the morning following Mr. Onorato's death, one of his employees found among his effects at his office in New Orleans an envelope addressed to a local attorney who represented the Reichard heirs, and in this envelope, which was delivered to the attorney, there was a communication addressed to him, admittedly in the handwriting and signed with the initials of the deceased, reading as follows:

"I owe $20,000 or more to Reichard Estate, so hurry my Attorney in collecting life insurance—Taxes for 1940–41–42 are unpaid, but I secured delay and you can easily settle with money my Attorney should pay over to you and Livaudais for the Reichards. "JLO"

Appellants allege that the net proceeds of the insurance made payable to the deceased's executors are an asset of his succession, and that they are entitled to receive therefrom partial payment of the fiduciary indebtedness to them, for the following reasons, each of which is pleaded in the alternative:

(1) That the communication constitutes a waiver by the deceased and those claiming under him of the statutory exemption of insurance proceeds from liability for debts.

(2) That the communication is an assignment by the deceased to the opponents of such policies of life insurance and the proceeds therefrom as security for fiduciary indebtedness to the opponents, which is binding upon his legatees or his legal heirs.

(3) That the communication constitutes a pledge or hypothecation of such life insurance policies for the payment of his debt, which is also binding upon his heirs.

(4) That the premiums paid to maintain these life insurance policies in force while deceased was acting as their agent were paid from the rental revenues of opponents, collected by the deceased in his fiduciary

capacity and by him appropriated to his own use and benefit; further, that, if these particular premiums were not paid with these particular funds, the deceased was in any event enabled to pay the premiums and maintain the policies of life insurance in force by virtue of the financial advantages accruing to him from his misappropriation, and that accordingly a constructive trust or equitable lien has been impressed upon the insurance proceeds in their favor, and, further, that in any event they are entitled to the return of the amount paid from the decedent's bank accounts for the payment of premiums on these policies.

Appellees take the position that the proceeds of the policies are exempt from liability for any debt of the deceased, of whatever nature, under the provisions of Act No. 189 of 1914, as last amended by Act No. 155 of 1934, and that the written communication relied on by opponents does not constitute a pledge of the policies or an assignment of any rights thereunder.

The title of this act is: "To exempt from liability for debt the proceeds, avails and dividends of all life * * * insurance * * *." Section 1 of the act, as last amended, provides:

"That the following shall be exempt from *all* liability for *any* debt:

"(1) The proceeds, avails and dividends of all life, including fraternal and co-operative, health and accident insurance.

 * * * * * *

"Provided, however, that there shall be excepted from the provisions of this Act a debt secured by a pledge of a policy, any rights under such policy that may have been assigned, and any advance payments made on or against such policy." (All italics ours.)

Appellants state that, since the insurance in the instant case was payable to the deceased's executors, the proceeds thereof are vested in his heirs by inheritance, and that any act of the deceased in regard to the insurance is binding on them, so that, if he waived the exemption from debt as to the proceeds or assigned or pledged the policies, his act is binding upon his heirs.

Appellants argue that the written instrument reflects the intent of the deceased to transfer to the Reichard heirs the proceeds of his life insurance policies, fully identifies the object assigned, and is effective as an assignment against the deceased or his heirs or testamentary legatees without delivery. They cite numerous authorities to the effect that no specific form of words or language is required under the law to constitute an assignment, and that any language which shows a clear intention to transfer the property and sufficiently identifies the subject matter is effective as an assignment between the parties without delivery of the subject matter.

█ We cannot agree with counsel that the instrument reflects a clear intention on the part of the deceased to pledge the insurance policies or assign any rights there-

under. On the contrary, it is doubtful to us whether the instrument reflects any intention whatsoever on the part of the deceased to assign or pledge. However, construing the instrument in the light most favorable to appellants, we do not think it is sufficient for an assignment or a pledge under the articles of our Civil Code dealing with these subjects.

Chapter 12 of our Code, which deals with the transfer or assignment of credits or other incorporeal rights, is found under Title VII, "Of Sale". The first eight chapters of this title deal with the rules applicable to sales generally, and the last five chapters, including Chapter 12, deal with the different kinds of sales that have rules particularly applicable to them. Therefore a transfer or assignment of a claim is a kind of sale, within the meaning of our Code. Article 2456 under this title provides:

"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."

That Article 2456 is applicable to an assignment was recognized by this court in Marshall v. Parish of Morehouse, 14 La. Ann. 689, wherein it was stated:

"The assignment * * * is, however, conclusive against him [the assignor] and

his legal representatives, notwithstanding there was no delivery; *for a sale is perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement. for the object, and for the price thereof, although the object has not yet been delivered, nor the payment made.* C.C. 2431 [now Art. 2456]."

Since an assignment is a kind of sale, an agreement must be reached between the parties to perfect it, and in the instant case no agreement was ever reached between Onorato and these opponents so as to perfect the sale, because Onorato died prior to the delivery of the written instrument, and its contents could not be communicated to the opponents since they were in occupied Europe at the time. Furthermore, according to Article 1810 of the Civil Code, "If the party making the offer, die before it is accepted, or he to whom it is made, die before he has given his assent, the representatives of neither party are bound, nor can they bind the survivor. * * *"

Moreover, we do not think that the instrument constitutes a pledge of the insurance policies or the proceeds thereof. Under Article 3133 of our Code, the pledge is a contract by which a debtor gives something to his creditor as security. for his debt, and, under Article 3152, it is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him unless he

has possession of it already by some other right.

Under these articles, the written communication, standing alone, is obviously not sufficient to constitute a contract of pledge. As we have previously pointed out, we do not think that this instrument reflects any intent to pledge the policies or the proceeds thereof, but, even if we should concede that it does, the creditors were not in possession of the thing pledged, nor was actual delivery made of it to them.

Appellants argue that, under the doctrine that the possession of the agent is the possession of the principal, the possession of Onorato under the agency relationship which existed between him and the Reichard heirs was at least a constructive possession in the Reichard heirs of the thing pledged, and that this constructive possession was sufficient to constitute the delivery necessary for the validity of the pledge.

The doctrine of constructive possession on the part of the principal for property possessed by the agent obtains when third parties are dealing with the authorized agent of the principal. But this doctrine has no application in the instant case, which involves the perfecting of a contract between the principals and the agent. If this doctrine were applicable here, then it could be argued that the mere possession on the part of the agent of the funds actually embezzled was delivery of them to the principals, the Reichard heirs, and that Onorato's obligation to them

would have been discharged by merely possessing their funds.

If we assume that Onorato by the written instrument intended to waive the exemption from debt of the life insurance proceeds—though this is by no means certain—, the question then presents itself of whether he could validly waive it.

Article 11 of our Civil Code provides that individuals cannot by their conventions derogate from the force of laws made for the preservation of public order or good morals, but in all cases in which it is not expressly or *impliedly* prohibited they can renounce what the law has established in their favor *when the renunciation does not affect the rights of others and is not contrary to the public good.*

Act No. 189 of 1914, as last amended, the pertinent part of which we have quoted hereinabove, clearly sets forth in its title that its purpose is "To exempt from liability for debt the proceeds, avails and dividends of all life * * * insurance * * *". After specifically providing for this exemption, the statute enumerates the ways in which the insurance proceeds can be excepted from this exemption, that is, by a pledge of the policy to secure a debt, by assignment of any rights under the policy, and in repayment of advance payments on the policy. Since the statute, after providing that the proceeds of life insurance *shall* be exempt from *all* liability for *any* debt, then specifically, expressly, and in detail sets forth the man-

ners in which the exemption can be waived, the implication is that the exemption cannot be waived in any other way. We therefore conclude that the statute provides the only ways in which the insured can except the proceeds of life insurance from the exemption.

In Succession of Le Blanc, 142 La. 27, 76 So. 223, 226, L.R.A.1917F, 1137, this court, in deciding that the proceeds of life insurance payable to the executors of the deceased's estate were covered by the exemption, observed:

" * * * The express mention of a debt secured by a pledge or assignment of an insurance policy, a loan or advance payment made on or against the policy, as excepted from the operation of the statute, *implies that there are no other exceptions.* * * * "

■ Statutes making the proceeds of life insurance exempt from debt have been enacted by numerous states of this country, and various text writers on insurance law inform us that such exemption is for the benefit of others as well as of the insured, and is for the public good.

" * * * Statutes exempting insurance payments from the liens of judgments, etc., are intended to exempt such payments from all claims of creditors. The purpose is to secure such insurance funds to the families of the insured persons, and to provide a fund after the insured's death for his loved ones.

"The purpose of such statutes must guide in their application, and the court must consider not only the origin of the act but every word of the amended statutes. * * * " 22 Appleman, Insurance Law and Practice, sec. 14581, p. 613.

"All the statutes bearing on the exemption of life policies or their proceeds seem based on the theory that, in the absence of an expressed contrary intent, the object of an ordinary life insurance policy should be considered as the protection of insured's family after his death, and that this object and desire is laudable and in accordance with public policy. * * * " 7 Cooley's Briefs on Insurance (2d ed.), p. 6508.

■ Since we have concluded that a waiver of the exemption by any means other than those provided by the statute is impliedly prohibited, and, further, since a renunciation by the insured of the exemption would affect the rights of others and be contrary to the public good, such waiver is within the prohibition of Article 11 of the Civil Code, and consequently Onorato could not waive the exemption by the document, whatever may have been his intention.

Opponents in brief refer us to the case of Michiels et al. v. Succession of Gladden, 190 La. 917, 183 So. 217. That case is authority for the proposition that an insured may make insurance proceeds under a policy which is payable to his executors or assigns available to his creditors for the payment of his debts by making such a pro-

vision in his last will and testament. We are not called upon in the instant case to express any opinion as to the correctness of our holding in that case, but, if the last will and testament of the deceased therein can be considered a waiver of the exemption in some other way or by some other means than those provided in the statute itself, and possibly it can, we do not propose to extend any further the right of the insured to waive the exemption, in view of the principles and reasons given by us hereinabove.

We now come to appellants' fourth and last contention, that the premiums paid to maintain these insurance policies in force while deceased was acting as their agent were paid from rental revenues collected by him in his fiduciary capacity and misappropriated to his own use, and that under these circumstances they are entitled to recover the net proceeds realized from these policies.

Before discussing this contention, it is well to point out that the issues here are between the legatees under the last will, represented by the executors, and the principals who were defrauded by the acts of their agent, the testator. The rights of no third persons or creditors are involved, so that the question of preference or privilege does not arise, and, regardless of our decision, the amount due any creditors of this insolvent succession will not be increased or decreased, as the final account, except as here opposed, has been homolo-gated and approved, and the funds ordered distributed in accordance therewith.

Appellants base the contention now being considered on fraud, and this fraud is the more reprehensible because committed by the deceased in breach of a fiduciary relationship against those to whom he owed the utmost sincerity and fidelity.

The first question, then, is whether the exemption provided in the statute can be successfully used as a shield to protect the fruits of a fraudulent act. In other words, can such statute operate to validate a fraudulent act, and offer to one who practices such reprobated fraud a refuge or sanctuary for the property so taken, so that it can be placed beyond the reach of those defrauded? The answer must be in the negative, for it was never the intention of the Legislature by this exemption to encourage fraud and to provide a safe depository for stolen funds. Furthermore, it is more important to the order of society to discourage and circumvent fraud than it is to secure to the family of the deceased insurance proceeds free from debt.

In the Ten Commandments, the basic law of all Christian countries, is found the admonition "Thou shalt not steal". This prohibition against the taking of the property of another is a natural law. Domat in his treatise on the Civil Law says of natural laws:

"The immutable laws are so called, because they are natural, and so just at all

times, and in all places, that no authority can either change or abolish them: and the arbitrary laws are those which a lawful authority may enact, change, and abolish, as there is occasion.

\* \* \* · \* \* \*

"\* \* \* there are many immutable laws which admit of exceptions and dispensations, and yet do not lose the character of immutable laws; *as, on the contrary, there are many of them which admit of no dispensation or exception.*

\* \* \* \* \* \*

"*This, the laws which enjoin honesty, fidelity, sincerity, and which forbid deceit, fraud, and all manner of tricking, are laws which can admit of no dispensation or exception.*

\* \* \* \* \* \*

"\* \* \* it is a natural and immutable law, that he who is the owner of a thing should always continue to have the property of it, until he has divested himself of it voluntarily, or until he be divested of it by some just and legal way. \* \* \* " 1 Domat's Civil Law (Strahan's tr.), pp. 49, 59, 60, 52.

■ There flows from this natural law the doctrine recognized in the civil law that, as between the owner and the thief, one whose property has been stolen may recover it even though the thief has changed the form of the property. As stated in 10 Scott, The Digest of Justinian, 35:2:53(14), p. 268, "Where anyone steals

a silver. ingot belonging to me, and makes cups out of it, I can either bring suit for the theft of the ingot, or a personal one for the recovery of the property.

"The same rule applies to grapes, and their unfermented juice, and seeds; for the action for the theft of grapes, their unfermented juice, and their seeds, can be brought, as well as a personal action."

This doctrine has also been recognized by this court in an opinion written by Justice DeBlanc in the year 1879 in the case of Pirtle v. Price et al., 31 La.Ann. 357. In that case the representative of a deceased sought to recover by means of a writ of sequestration certain goods in the possession of the defendants. The writ was sought on the grounds that the deceased died in the home of the defendants, and that since his death these defendants had secretly and fraudulently taken the sum of $2980 in cash which belonged to him and with this money purchased the goods seized under the writ. The defendants sought the dismissal of the writ on the ground that the plaintiff did not swear to the ownership of the property seized or that he had a lien, privilege, or mortgage on it. This court refused to dissolve the writ, and we find the well written and well reasoned opinion in that case very pertinent here. We quote at length from the opinion, thus:

"If—as charged—defendants did steal those funds; if—with those funds—they paid the price of the goods, have they ac-

quired, as to the goods thus paid for, a title sanctioned by any law, and which can justly be recognized by any court? Most assuredly not. If that title, which *has passed* from the merchants who sold, has *not vested* in the thieves who bought, who can have a higher right to the goods, and by whatever name that right may be called, than the despoiled succession?

\* \* \* \* \* \*

"The chosen depositary and attorney-in-fact are each bound to restore to the depositor and principal, even that which they have unduly received; and it cannot be that thieves are entitled to a favor or privilege which would be denied to confidential agents. That an action lies against them, for the recovery of the money stolen, is indisputable; but that action would be as barren as insufficient, when—as in this instance—the fruits of the alleged crime appear to be their all, or at least all that can be reached by legal process."

There follows a quotation from Troplong, du Mondat, p. 409, to the effect that public interest and morals require that the author of an evil act should not derive any profit therefrom which encourages him to do evil, and in case of doubt it is always better to prefer the interpretation the most unfavorable toward him who offended public honesty and the most appropriate to his punishment. The opinion then continues:

"When—as remarked by Mr. Story—the profits are made by a violation of duty, it would be obviously unjust to allow the agent (and much more unjust to allow a thief,) to reap the fruits of his own misconduct; and as held by this court—when there has been such an appropriation of the trust property that it can be clearly identified, the change which it has undergone in point of form, should not be permitted to frustrate the pursuit of the principal, and—at his expense—put a profit in the agent's pocket.

"Story on Agency, 207. 4 A. 415.

"In New York a majority of the judges of the Court of Appeals held 'that it is an elementary principle in the law of all civilized communities, that no man can be deprived of his property, except by his own voluntary act, or by operation of law; that a wilful wrongdoer acquires no property in the goods of another, either by the wrongful taking or by any change wrought in them by his labor or skill, however great that change may be.'

"The same principle is to be found in the Digest of Justinian. 'If anyone shall make wine with my grapes, oil with my olives, or garments with my wool, knowing that they are not his own, he shall be compelled by action to produce the said wine, oil or garments.'

"In his Commentaries, the late Chancellor Kent declared that the English law will not allow a man to give a title to the property of another upon the principle of accession, if he took the other's property wilfully as a trespasser; and that it was settled as early as the time of the Year Book, that *whatever alterations* of form any prop-

erty had undergone, the owner might seize it in its new shape, if he could prove the identity of the original materials.

"Relying on those authorities, the New York court decided, with but two dissenting opinions, that where a quantity of corn was taken from the owner by a wilful trespasser and converted by him into whiskey, the whiskey belonged to the owner of the corn. * * *

"*One, whose money has been stolen, and used by the thief to pay the price of property, which is found in the thief's possession, can—at his option—sue either to recover the money, or the property. As to third parties, he may lose his title, but—under no circumstances—can his title be considered as inferior to the insolent pretension of the rascal by whom he was robbed.*

"The facts alleged and sworn to by the curator do disclose a sufficient cause for the issuance of the writ of sequestration, and—as to that cause—the law, by implication, if not otherwise, is not absolutely silent. *Were it silent, this is—manifestly—one of the few instances when an appeal would have to be made to natural law and reason, to baffle and to defeat a criminal and infamous speculation.*"

■ Under these principles of law, in the event a thief steals money and with the funds of his theft purchases or buys insurance, the owner can recover from the proceeds of the insurance the amount of the money so taken. The title of the owner cannot be considered as inferior to that of the thief or his representative, for, as pointed out above, the thief himself has no title whatever to the property stolen.

The courts of other states almost without exception hold that, when embezzled or stolen funds are used to purchase exempt insurance, the exemption does not deprive the owner of recourse to the proceeds from such insurance. This holding is based on what is termed the common law constructive trust theory, which, as the writer appreciates it, is that the embezzler gets legal title when he uses the funds so entrusted to him to purchase other property, but he holds the equitable title in trust for the one from whom he has embezzled or stolen the funds.

■ Under the doctrine of our civil law, the embezzler never gets any kind of title against the one from whom he steals, for, when he purchases with stolen funds, the title is in the one from whom he stole the funds. Whatever may be the distinction between the two doctrines, the underlying principle of each is justice, equity, and fair dealing.

Under the civil law doctrine that title never passes, it can be argued that the owner, as between him and the thief, is entitled to the entire proceeds of exempt life insurance, where he can show that the object, the proceeds of the insurance, is purchased with the identical funds stolen.

The decisions of the courts of other states on the question of what portion of

■■■■■■■■■■■■

exempt life insurance is available to the person whose funds have been stolen or embezzled and used to pay the insurance premiums due thereon are not in complete harmony. The majority of the courts hold that, where only a part of the premiums has been paid with the embezzled funds, the party from whom the funds were misappropriated is entitled to a proportional part of the policy proceeds. These cases follow this reasoning: Vorlander et al. v. Keyes, 8 Cir., 1 F.2d 67; Brown v. New York Life Ins. Co. et al., D.C., 58 F.Supp. 252, affirmed, 2 Cir., 152 F.2d 246; Shaler et al. v. Trowbridge et al., 28 N.J.Eq. 595; McConnell v. Henochsberg et al., 11 Tenn. App. 176; Massachusetts Bonding & Ins. Co. v. Josselyn et al., 224 Mich. 159, 194 N.W. 548; Holmes v. Gilman et al., 138 N.Y. 369, 34 N.E. 205, 20 L.R.A. 566; Jansen v. Tyler et al., 151 Or. 268, 47 P.2d 969, 49 P.2d 372; Truelsch v. Northwestern Mutual Life Ins. Co. et al., 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914. Other courts are of the view that recovery is limited to the amount of premiums paid with the misappropriated money. Board of Public Instruction for Bay County v. Mathis et al., 132 Fla. 289, 181 So. 147; American Nat. Bank of Okmulgee v. King et al., 158 Okl. 278, 13 P.2d 164; Thum v. Wolstenholme, 21 Utah 446, 61 P. 537. The Supreme Court of Georgia held in the case of Bennett v. Rosborough et al., 155 Ga. 265, 116 S.E. 788, 26 A.L.R. 1397, that due to the exemption the proceeds of life insurance cannot be reached even in case of fraud.

One of the justices of that court, however, wrote a vigorous dissenting opinion with which another justice concurred, and this decision, apparently isolated in the jurisprudence, has been criticized. See Note, 26 A.L.R. 1408.

■■■ In our opinion, in this case the civil law doctrine should not be applied to the extent that the proceeds of exempt life insurance, when the premiums are paid or the insurance purchased with stolen funds, should be given to the owner of the property thus stolen, but he is entitled to recover the amount of the stolen funds which was used by the thief in payment of premiums or purchase of the insurance itself. By permitting this recovery, the fraud is made ineffective, equity and justice are served, and the public good and the policy of the statute creating the exemption are in no way impaired since the family and loved ones of the insured are assured of the proceeds that the misappropriated money bought.

In the instant case the fraud, a misappropriation of a sum in excess of $26,000, is admitted. It is also admitted that the deceased commingled the fund thus misappropriated in the bank accounts with his own money and the money of others, and that the premiums on these life insurance policies in the amount of $5328.86 were paid from these commingled funds. It is also true that the personal expenditures of the deceased during the time he was agent of the opponents far exceeded the net profit

realized from his business, and that he was hopelessly insolvent at his death. Under these circumstances, are we justified in saying that the proof is sufficient to show that the deceased paid the premiums on this insurance with funds which he embezzled from these opponents?

Originally the jurists of the common law were of the opinion that, once a wrongdoer mingled appropriated money with his own money, the rightful claimant's interest or title was terminated because "money has no earmark". This opinion had entirely disappeared by 1880, and because of the doctrine of equitable liens at common law the defrauded person is now even recognized to have a claim to the commingled funds, or property acquired with them, superior to that of the general creditors of the defrauder. See general discussion of problem of commingled funds, 3 Scott on Trusts, sec. 515, pp. 2461 et seq. By peculiar coincidence it was also in the year 1880 that a court of this state made the following enlightened statement regarding the ability of an agent to defeat the title of his principal to property entrusted to him:

"We know of no process by which the agent can become the owner of the money or the property of his principal, entrusted to him for a special purpose. The unfaithful or imprudent agent may so deal with the property of the principal *as to subject it to the rights of his creditors or other innocent third persons: he may make the tracing and identification of it, and the proof of ownership difficult, even impossible:* he may illegally convert it to his own uses, and subject himself to criminal prosecution, under the statute, for embezzlement or breach of trust with respect to it; *but he cannot, as against his principal, make it his own; nor can he transmit it to his succession by will, or ab intestate."* Succession of Boisblanc, 32 La.Ann. 109.

This statement was quoted and expressly approved in the case of Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366, wherein the claim of a cestui que trust was denied as to a commingled fund. The court was careful to point out in that case, however, that the real controversy was between the cestui que trust and other creditors of the trustee, and not between the cestui que trust and the trustee. On principles of equity and justice we would be most reluctant to hold, in a controversy between a principal and an agent, that the principal would lose all title to money entrusted to the agent simply because the agent has commingled the money with his own funds.

The question of the proof, where embezzled funds have been commingled with other funds of the embezzler and life insurance premiums have been paid from the commingled fund, necessary to establish that the premiums have been paid with the funds so embezzled has been passed upon by the courts of other jurisdictions. Some courts hold that such proof may be established by a preponderance of the evidence, and others

by circumstantial evidence. For example, in McConnell v. Henochsberg et al., supra, the deceased embezzled funds over a long period from a bank and commingled these funds with funds of his own. From this commingled fund he paid the premiums on certain life insurance. The court, after pointing out that it was necessary to trace the misappropriated fund to the property so acquired in order to be entitled to recover the proceeds of exempt insurance, held that the proof was sufficient, and in the course of the opinion said:

" * * * It would be a subversion of justice and all rules of equity to say, that a trusted employee charged with the duty of handling the funds of his employer, through a fraudulent scheme and systematic course of fraud and deception to steal the funds of his employer, and to mix such stolen funds with his own funds and out of the mingled funds, mingled with deliberate fraudulent intent to conceal and to hide away the identical funds stolen, and to invest such funds in property taken in his own name, could reap the fruits of his own misdoing at the expense of the employer."

See also Truelsch v. Northwestern Mutual Life Ins. Co. et al., supra.

The facts in the case of Brown v. New York Life Ins. Co. et al., supra, in which there was an embezzlement, a commingling of funds, and the purchase of life insurance premiums from the commingled fund, are very similar to those in the McConnell case, supra. In the course of the opinion in the Brown case the court stated, citing authorities in support thereof:

" * * * once *fraud* has been proven, the doctrine of commingling of funds applies and the constructive trustee will be liable if he does not *segregate* the fund." 58 F.Supp. 252, 258.

 This statement is a requirement of proof and is a rule of evidence, to the effect that, if funds are commingled, and *fraud is proved,* the burden of proof is on the defrauder to establish that the premiums were not paid from the funds embezzled. The purpose of all rules of evidence is to ascertain the truth, and by this rule the truth is more likely to be produced than by the rule which would cut off the right of the person defrauded to his funds if they have been commingled. We approve this rule and consider it to be the proper one to apply to the case here under consideration.

In the Brown case the doctrine of constructive trust was applied, but, even in those states where that doctrine prevails, it is necessary to trace the fund embezzled to the property acquired to establish that it is trust property, just as it is under the civil law in order to establish title, and there is no reason why the rule of evidence applicable under the common law doctrine should not be applied here. If it were otherwise, the exemption provided in the statute and relied upon by appellees could be made to provide a sanctuary for stolen funds by the simple device of the embezzler's first taking care to deposit such funds in a

bank account with some of his own funds and thereafter making withdrawals from the funds so commingled to pay the insurance premiums, and the wrongdoer or his representative would profit at the expense of others, contrary to all concepts of justice.

We do not mean to hold, nor do we say, that this rule of evidence would be applicable in any case except where *the contest is between the person defrauded and the defrauder or his representatives, for the reason that it might operate in other cases to create a preference or privilege where none exists by statute.*

 Under the rule of evidence applied here, we conclude that under the facts and circumstances of this case the deceased, Onorato, used the funds embezzled from the opponents to pay premiums in the amount of $5328.86, as hereinabove set forth, in the absence of any proof to the contrary, and that opponents are therefore entitled to judgment for this entire amount.

For the reasons assigned, the judgment appealed from is amended by increasing the amount ordered paid to the opponents from $4283.08 to $5328.86, and as thus amended the judgment is affirmed; appellees to pay all costs.

McCALEB, Justice, dissenting in part.

I am in accord with the resolution of the majority that the life insurance policies were neither assigned nor pledged to appellants by the deceased. And I also agree

that Act No. 189 of 1914, exempting "from all liability for any debt" the proceeds of life insurance, save in the instances specifically detailed therein, implies that there are no other exceptions and that, therefore, the deceased could not waive its provisions to the detriment of appellees. But I cannot subscribe to the ruling that appellants are entitled to recover $5328.86, allegedly representing a portion of the amount the deceased embezzled from appellants, which he is supposed to have used to pay premiums on the policy.

In the first place, I encounter difficulty in following the theory on which the majority deduce that the $5328.86, which was paid by decedent as premiums on the policies in contest during the time he was acting as agent for appellants, is part of the $26,000 he collected for appellants' account. It is shown that, while acting as appellants' agent, the deceased deposited in his bank account $314,875.91 from various sources and that all the money collected for them was deposited and commingled with the other funds in the account. Still, it is professed that, because he paid the $5328.86 as premiums on the life insurance policies in contest during the period that he was representing appellants, he must, perforce, have paid it from his peculations rather than from other funds belonging to him. This conclusion is reached by indulging in a presumption evolved by common law courts that, wherever misappropriated funds are shown to have been indiscriminately com-

mingled with other monies in the bank account of the person who has breached a trust, the burden shifts to that person to show a segregation of the funds. There may be some justification for this doctrine where the litigation involves only the defrauded person and his unfaithful agent for, in such case, the latter is in a better position than anyone else to account for the disposal of the funds—but, here, appellees, as holders of the insurance proceeds which are exempt from decedent's debts, are obviously without any knowledge concerning the title of the funds used in making the premium payments. Hence, to rule that they nevertheless have the onus of tracing the title of these funds is tantamount to applying a conclusive presumption against them and thus subject the insurance proceeds to the reimbursement of the misappropriated funds, despite the fact that the record is barren of any proof exhibiting that the monies actually used in paying the premiums belonged to appellants.

Moreover, even if it be assumed that the $5328.86 which was used for the payment of premiums is traceable to the misappropriated funds, the deduction of the majority that the proceeds of the life insurance are subjected to appellants' claim for the return of these premiums, appears to me to be nothing more than the creation, by indirection, of a privilege on the proceeds in favor of appellants in partial reimbursement of decedent's debt when none exists by statute and in plain violation of Article 3185 of the Civil Code. See also Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366 and authorities there cited. And it will not do to say that there are no other unpaid creditors of the succession as this circumstance does not enhance the validity of the reasoning underlying the ruling. Indeed, the paradox of the result reached in the main opinion is evident for the basis, upon which appellants' claim to the entire proceeds is rejected, is that Act No. 189 of 1914 does not permit the subjection of the avails to the payment of the insured's debt but yet it is finally resolved that those same proceeds are amenable to part of the debt—that is, to the extent that the misappropriated funds were used in paying insurance premiums. For my part, I see no difference, insofar as the application of the legal exemption is concerned, between debts which emanate fom legitimate causes and those resulting from a breach of trust. Surely, the statute makes no distinction in this regard and it is not our function to write such an exception into the law. Nulsen v. Herndon, 176 La. 1097, 147 So. 359, 88 A.L.R. 236. True enough, a majority of the common law states provide authority for the prevailing opinion but those pronouncements are founded on the constructive trust or equitable lien doctrine, which is unknown in Louisiana; albeit, the antithesis of the provisions of our Code dealing with privileges.

I think that the judgment should be amended, as prayed for by appellees, and affirmed in all other respects.