691 So.2d 990 (1997)
Ellen LACKEY
v.
Steven LACKEY and Dolly Jean Lackey.
No. 93-CA-01231-SCT.
Supreme Court of Mississippi.
April 3, 1997.
*991 Michael T. Parker, Pat H. Scanlon, Scanlon Sessums Parker & Dallas, Jackson, for appellant.
S. Smith Bonner, Jackson, for appellee.
En Banc.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
The present case calls upon this Court to determine whether Ellen Lackey, defrauded by a trustee of hundreds of thousands of dollars in trust property, may properly attach the proceeds of a life insurance policy purchased by said trustee at least partly with trust property and paid unto the beneficiaries of said policy. The Chancellor ruled that Ellen could recover the premiums paid with stolen property, but she was not permitted to attach the proceeds of said policy.
This Court concludes that a constructive trust should be imposed on the proceeds of the policy to the extent that stolen trust funds were used to purchase the policy. We also consider the proper allocation of the burden of proof as between the policy beneficiary and the trust beneficiary with regard to the question of the proper allocation of the proceeds between the constructive trust and the policy beneficiary. We conclude that once it is shown that stolen funds or commingled funds were used in the payment of policy premiums, the burden should be on the policy beneficiary to demonstrate which, if any, funds other than the stolen trust funds, purchased the policy. Accordingly, we reverse and remand.

II. STATEMENT OF THE FACTS AND CASE
Claud Johnson Lackey ("CJL") and his wife, Jewel Biggs Lackey ("JBL") had two children, Claud, Jr. ("Buster") and Richard ("Dick"). CJL died testate in 1968, and his will provided, among other things, for the establishment of a trust in favor of JBL. The will also provided for Buster and Dick to act as co-trustees of a "residuary trust", and the will provided for the trust property to be divided into equal shares for the benefit of Buster and Dick. The will provided that "the share or portion of the share allocated to each beneficiary (Buster and Dick) shall constitute and be administered as a separate trust", but the will did not require an actual physical division of the property.
JBL died testate in 1982, and her will was very similar to that of her late husband CJL, providing that Buster and Dick were to serve as co-trustees of a trust in which equal shares were to be administered as separate trusts. Both wills in question prohibited the sons from distributing money or income to themselves; Buster's consent was necessary to authorize distributions to Dick, and vice versa. This arrangement enabled the brothers to ensure that the distributions were equal and that the provisions of the trust were not abused by favoring one brother at the expense of the other.
The aforementioned safeguards against the abuse of the trust provisions worked well up and until January 16, 1983, when Dick died, leaving a widow and a fourteen-year old daughter, Ellen. In theory at least, Ellen inherited Dick's one-half interest in the CJL residuary trust and in the JBL estate/residuary trust, but the actions of Buster ensured that Ellen did not receive this inheritance. Both CJL's and JBL's wills provided for the appointment of replacement trustees, and Buster filed a petition in chancery court to have E.O. McCormick, with whom he gambled, appointed as replacement trustee for Dick.
Dick's family was unaware of McCormick's relationship with Buster, and Buster succeeded *992 in having him appointed as co-trustee. During his tenure as co-trustee, McCormick was convicted of a federal racketeering offense related to his gambling. Buster was a serious gambler as well, and the record reveals that, during his tenure as co-trustee, Buster made payments of $386,002.00 to various casinos in Las Vegas in spite of earning a total income during said period of less than $120,000.00. Buster's family does not dispute, that, from the date of Dick's death in 1983 until Buster's own death in 1988, Buster, with the aid and abetment of McCormick, received hundreds of thousands of dollars in unauthorized distributions from the trust and estates in question. Testimony at trial indicated that the standard trust practice during this period was for Buster to send blank checks drawn on the estate and trust accounts to McCormick, who would routinely sign them and send them to Buster without inquiry of any kind. Buster would then sign the checks and use the trust property for his own personal benefit. Ellen, meanwhile, received nothing.
Testimony also revealed that McCormick would routinely sign warranty deeds provided by Buster, and he would thus consent to the conveyance of trust property without giving any consideration to the interests of Ellen or the trust in general. Buster often transferred money from the estate and trust account into his own personal accounts, and to his business accounts, known as Lackey Land and Cattle Company (LL & CC) and Lackey Lumber and Building Materials, Inc., in an apparent effort to disguise the transfers as business expenses.
The Master, appointed by the Chancellor, concluded in his report that:
(T)he wills of both CJL and JBL expressly prohibit a trustee from in any manner participating in a decision to make a distribution or allotment of income or corpus of the trusts to or for his benefit or the benefit of any person the trustee is legally obligated to support. Notwithstanding such proscribed actions, the evidence is overwhelming that Buster alone made all of the decisions concerning distribution of trust and estate funds to himself and his immediate family without input or considered action by E.O. McCormick, the other trustee.
The actions of Buster which are of the greatest interest to this Court in the present appeal center around the purchase of a life insurance policy in the amount of $1,100,000.00 from New York Life Insurance Company. The record indicates that the thirteen premiums on said policy were paid out of funds from the LL & CC Account, which account consisted in large part of funds stolen from the trust. Upon Buster's death, Buster's wife Jean received $624,000 in insurance proceeds, while his children Lynn L. Phillips and Steven J. Lackey received the remaining $476,000. Although the Master concluded that the insurance premiums were likely paid in large part out of the stolen trust funds, he also concluded that the stolen funds in the LL & CC account had become intermingled with funds from other sources and that the stolen funds could thus not be adequately traced into the insurance premiums. Specifically, the Master found that:
There is another side to this matter, however. The record is clear that, while thousands of dollars from the trust/estate accounts were deposited in Buster's LL & CC account, other thousands of dollars were deposited into that account from sources other than the trusts/estate. The record does not reflect what percentage of the LL & CC account funds are distributions from the trust/estate. There are no calculations reflecting the percentage that were deposited from any source. Under the plaintiff's theory, the trust would be entitled to that fractional portion of the insurance proceeds equal to the fractional portion of the insurance premiums wrongfully paid from the trusts/estate. However, the record does not allow such calculation.
After a lengthy trial, the Chancellor awarded Ellen a judgment (based on the Master's findings) against E.O. McCormick in the amount of $850,567.00, a judgment against Buster's estate in the amount of $1,648,379.40, and the ruling set up a new trust (the "Lackey Family Trust") to ensure that all future distributions would go for Ellen's benefit before any distributions were *993 made to Buster's family. However, in accordance with the Master's findings regarding the inability to trace the stolen trust funds to the life insurance policy, the Chancellor denied Ellen the right to execute her judgment against the life insurance proceeds. Steven and Lynn perfected an appeal from the Chancellor's ruling which was later voluntarily dismissed, and Ellen cross-appealed from the ruling denying her the right to execute against the insurance proceeds in the possession of Jean, Lynn, and Steve. Ellen dismissed the appeal with regard to Jean following Jean's declaration of bankruptcy.

III. LAW
This Court is presented with the limited issue of the ability of Ellen to seize the insurance proceeds from Buster's life insurance policy currently in the possession of his children, Lynn and Steve. The Chancellor denied Ellen the right to seize upon these assets based on a variety of legal and equitable notions. Miss. Code Ann. § 85-3-11 provides that life insurance proceeds are largely exempt from creditors, and Buster's children briefly argue in support of this proposition. As noted in Succession of Onorato, 219 La. 1, 51 So.2d 804, 812 (1951), however, the near-universal rule is that state exemption statutes do not apply to life insurance policies purchased with stolen funds. The split of authority among jurisdictions is largely with regard to the issue of whether the defrauded party should be limited to recovering the amount of the premiums paid or whether the party should be able to attach the insurance proceeds.
The Master found that Buster improperly deposited trust and estate funds into the LL & CC account in the amount of over fifty-five thousand dollars and that these funds had been commingled with other funds not stolen from the trust. The Master nevertheless concluded that Ellen had not met her "burden" of proving that Buster used the stolen funds in the account, rather than his personal funds in said account, to purchase the life insurance policy. This Court holds that the Chancellor, who based his ruling in part upon the aforementioned findings by the Master, was in error as a matter of law in requiring Ellen to prove the extent to which the insurance premiums were paid for with funds stolen from the account.
This Court concludes that the better reasoned approach is that Ellen and Steve should bear the burden of proving that the premiums were not paid for out of the portion of the funds in the commingled account which were misappropriated from the trust. As the innocent party, this Court considers it improper that Ellen be required to demonstrate that the premiums were paid from the portion of the commingled account which contained funds stolen from her. In State ex rel. King v. Harvey, 214 So.2d 817, 820 (Miss. 1968), this Court noted the traditional rule that "where commingling of trust property with other property is through the fault of the trustee, the entire mass will be treated as trust property or funds, except insofar as the trustee may be able to distinguish the two." This rule should clearly be applicable in the present case, and Steve and Lynn should be required to establish that the stolen funds in the account were not used to purchase the life insurance policy.
The Master applied a similar logic in noting that Buster had a legal right to one half of the trust property under the terms of the trust, and he concluded that Buster accordingly could have gotten his hands on sufficient trust funds to purchase the insurance policy without defrauding Ellen and without breaching any of his duties as trustee. Specifically, the Master concluded that:
All things considered, this writer is not satisfied that the record reflects that all of the policy premiums were ultimately paid by the trusts/estate, or what fraction of the premiums were paid by distributions from the trust/estate. However, even had the record so reflected, Buster was, in fact, entitled to the distributions, and equity does not require that his beneficiaries be punished because (of) his wrongful methods of effecting the distributions. Stated differently, if Buster, by following the letter and spirit of the trusts, could not have lawfully gained the distributions with which the premiums were paid, if such occurred, then the plaintiff may be entitled to receive the policy proceeds in the fractional *994 portion that trust funds were ultimately used to pay the premiums. However, Buster could have lawfully gained such distributions.
The Master's view might have merit if Buster had only used his egregious methods to obtain his own half of the trust assets and left Ellen's half undisturbed. However, the record is clear and undisputed that Buster used his methods to completely deplete the trust of all of its assets, including Ellen's one-half share thereof. Buster misappropriated virtually all of the trust assets, and the Master's reasoning in effect gives Buster the "benefit of the doubt" that the stolen funds which are lost forever, such as the gambling losses, are in effect to be considered Ellen's losses. The Master reasons that the assets which are still in existence in some form are to be viewed as assets which Buster could have legally acquired under his one-half share of the trust. Clearly, the more equitable approach is to give Ellen, as the defrauded and innocent party, the benefit of the doubt that the remaining assets are traceable to her half of the stolen funds.
The case law regarding the ability of a defrauded party to seize upon life insurance proceeds of the defrauding party is divided, with many of the cases involved predating the second world war. Steven and Lynn cite Onorato, in which case the Louisiana Supreme Court limited the recovery of stolen funds to the premiums paid for the life insurance policy, holding that:
In our opinion, in this case, the civil law doctrine should not be applied to the extent that the proceeds of exempt life insurance, when the premiums are paid or the insurance purchased with stolen funds, should be given to the owner of the property thus stolen, but he is entitled to recover the amount of the stolen funds which was used by the thief in payment of premiums or purchase of the insurance itself. By permitting this recovery, the fraud is made ineffective, equity and justice are served, and the public good and the policy of the statute creating the exemption are in no way impaired since the family and loved ones of the insured are assured of the proceeds that the misappropriated money brought. Onorato, 51 So.2d at 804. See also Akin v. Security Savings and Trust Co., 157 Or. 172, 68 P.2d 1047 (1937).
Ellen cites the case of Truelsch v. Northwestern Mutual Life Insurance Company, 186 Wis. 239, 202 N.W. 352 (1925), in which the Wisconsin Supreme Court endorsed this equitable remedy, holding that:
We cannot sanction the proposition that a fiduciary may embezzle large sums of money, use some of it in maintaining life insurance and that the injured party has no remedy except to recover the amount paid for the premiums, which may be only a small fraction of the amount embezzled. It would open too wide a door to the perpetration of the grossest fraud.
Vorlander v. Keyes, 1 F.2d 67, 69-70 (8th Cir.1924), sets forth the rationale adopted by many of those courts which hold that the proceeds of the policy should be deemed to be held in a constructive trust for the benefit of the defrauded party:
One who, acting in a fiduciary capacity, secretly and wrongfully, and therefore, fraudulently, uses fiduciary funds to purchase real estate or personal property, including policies of life insurance, for his own benefit and puts it in his own name, takes the title and interest in it as a trustee ex malefico for the owner of the misappropriated funds he thus uses, the cestui que trust. The equitable ownership and title of the misappropriated funds and the fruits thereof remain in the cestui que trust as long as they can be traced, and the trustee holds nothing but the naked title for the exclusive benefit of the cestui que trust.
In equity, not only the property which the trustee acquires with the misappropriated funds, but all its fruits, in every form, its increase, its income, other property acquired by the trustee by the exchange or use of it in any way, become, at the option of the cestui que trust, his property, unless it has passed into the hands of a bona fide purchaser for value without notice of the misappropriation.
In no event is the trustee ex malefico entitled in equity to any benefit to himself *995 from the use of the trust funds... . Nor may another, in this case the wife, now the widow of the trustee ex maleficio, though herself innocent of the fraud, who has paid no consideration for the property purchased with the misappropriated funds or for their fruits, hold any of them against the cestui que trust, the owner thereof.
Vorlander, 1 F.2d at 69-70. Another case reaching a similar result is Brown v. New York Life Ins. Co., 152 F.2d 246 (9th Cir.1945), in which the Ninth Circuit Court of Appeals imposed a constructive trust on proceeds of a life insurance policy purchased with funds from an account which contained stolen funds co-mingled with funds from legitimate sources. The Court held that:
Having previously violated the trust and confidence reposed in him by the Bank and imposed on him by law, neither equity nor the law will permit him to secretly and surreptitiously juggle or apply those credits to the payment of insurance premiums rather than to the reduction of his prior defalcations, thereby serving his interests at the expense and to the prejudice of an employer who was wholly ignorant of such unlawful operations.
Brown, 152 F.2d at 250.
In G & M Motor Company v. Thompson, 567 P.2d 80 (Okla. 1977), one of the most recent cases found on this issue, the trial court awarded a defrauded party a pro-rata share of insurance proceeds by imposing a constructive trust on the proceeds of a policy purchased partially with embezzled funds. The Court of Appeals reversed, holding that the defrauded party should only be entitled to recover for the amount of the premiums paid, together with interest. The Supreme Court of Oklahoma reversed the appellate court ruling and reinstated the trial court's ruling imposing a constructive trust on the proceeds, even though the embezzled funds in question had been co-mingled with lawfully acquired funds. Citing the Restatement of Restitution, the Court held that:
Just as the claimant is entitled to enforce a constructive trust upon property which is wholly the product of his property, so he is entitled to enforce a constructive trust upon property which is the product in part of his own property and in part of the property of the wrongdoer. The difference is that where the property is the product of his property only in part, he is not entitled by enforcing a constructive trust to recover the whole of the property, but only a share in such proportion as the value of his property bore to the value of the mingled fund... . Having carefully considered the matter, we adopt the Restatement view. Thompson, 567 P.2d at 84.
This Court concludes that the approach in Thompson and similar cases, imposing a constructive trust on a pro-rata share of the insurance proceeds paid for with stolen funds, should be applied in the present case based on the facts and equities herein.
Buster stole massive amounts of funds from an innocent girl to whom he owed both the legal fiduciary duties of a trustee as well as the familial duties owed to a niece. The record reveals that Buster's family shared in the enjoyment of the stolen funds, and Buster's children do not deny said fact. Steven and Lynn argue that:
Cross-appellant argues that Buster and his family lived on over one million dollars he misappropriated for five years. That is not exorbitant, considering the style this family was accustomed to. Ellen, in her brief, says that because of this, and because she got nothing, she should have the proceeds from the life policy and that the intent of the testators was that she should get the same as Buster's family; and the policy proceeds, if given to her, would carry over the testator's intent. This had nothing whatsoever to do with Buster's using his part to support his family or not any other use. It is apparent that Ellen was not suffering and always maintained under her usual standard of living. So the purchase of the insurance was of no harm to her.
The argument that Ellen was able to maintain her "usual" standard of living while Buster and his family lived very well on massive amounts of funds stolen from Ellen is less than persuasive. The argument that spending one million dollars in misappropriated funds in five years is not "exorbitant" is *996 similarly unpersuasive in addition to being beside the point. This Court considers it significant under considerations of equity that Steve and Lynn enjoyed the fruits of Buster's misdeeds, regardless of the amount of funds stolen, and these parties can thus not be said to come before this Court with entirely clean hands.
Although Steven and Lynn do not bear direct responsibility for their father's breaches of fiduciary duty, they should nevertheless not be permitted to retain the insurance proceeds to the extent that said premiums were paid for out of the trust funds. Buster cared for the welfare of his own children, as is evidenced by the insurance policy taken out by him, but he showed a callous disregard for the welfare of his niece. If Buster had attempted to plan for his family's welfare in the event of his death by merely saving up the stolen trust funds in a bank account, then Ellen could clearly seize upon said assets with her judgment against Buster's estate. The view set forth in the Onorato decision would allow Buster to accomplish via a life insurance policy what he would be unable to accomplish by building up an inheritance with stolen funds, and the Onorato opinion itself notes that the state exemption statutes should not be misused as a shelter for stolen funds. Onorato, 51 So.2d at 812.
In the view of this Court, it would also be unwise to adopt a blanket rule permitting the attachment of insurance proceeds in all cases involving breaches of fiduciary duty or fraud. In the view of this Court, a better approach is to consider the constructive trust in insurance proceeds to be an equitable remedy which should be available in appropriate cases. It is difficult to imagine a case in which the equities more strongly favor the utilization of such an extraordinary remedy than the present one.
The Master found that requiring Steve and Lynn to share the policy proceeds with Ellen would be "unusually harsh and punitive to ... Steve and Lynn and it would have the effect of creating a windfall for Ellen." This Court agrees that Ellen should not receive a windfall, that is, she should not receive more of the insurance proceeds than is required to make her whole, including her expenses in litigating the present controversy. Also, Buster's children should be allowed to retain the insurance proceeds in proportion to the extent that they are able to demonstrate that the insurance proceeds were paid for with funds legitimately acquired by Buster. The ruling of the Chancellor in denying Ellen the right to recover from the proceeds of the insurance policy is reversed, and the case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
SULLIVAN, P.J., and PITTMAN, BANKS, JAMES L. ROBERTS, Jr., SMITH and MILLS, JJ., concur.
DAN LEE, C.J., concurs in result only.
McRAE, J., dissents with separate written opinion.
McRAE, Justice, dissenting:
I disagree with the majority's conclusion that a constructive trust should be imposed upon the proceeds of the insurance policy at issue and that the burden is on the policy beneficiaries to show the extent to which funds other than those stolen from the trust were used to pay the policy premiums. Because of our constitutional prohibition against interfering with a contract, we cannot tamper with the proceeds of insurance policy naming Stephen and Dolly Jean Lackey as beneficiaries unless Ellen Lackey can show, at the time the insurance contract was entered, that funds fraudulently obtained from the trust account were used to purchase the contract and continue to pay the premiums. The chancellor and the master were correct in their findings. Accordingly, I dissent.
The record indicates that Buster Lackey was embezzling funds from the trust account over a long period of time and co-mingling the funds with those from his business. It was established that funds, indeed, were improperly taken from the trust account. Some of those funds were co-mingled. No paper trail showing just when the trust money was taken and when it was mingled with Buster's other funds was ever proven. At the time the insurance policy at issue was taken out, as opposed to when the premiums *997 were paid, which funds did Lackey use? We do not know. The only way that fraud can be proven and the insurance contract modified to give Ellen Lackey a percentage of the proceeds along with the intended beneficiaries is to show that at the time the contract was entered, the money used to pay the initial policy premium was all fraudulently procured.
The chancellor, therefore, correctly ruled that Ellen Lackey is entitled to recover only the amount of the premiums paid by funds with which her uncle absconded. Jurisdictions are divided as to the treatment of insurance policy proceeds when the premiums are paid for with embezzled funds. Miss. Code Ann. Section 85-3-11 provides that life insurance policy proceeds are largely exempt from creditors and that the party from whom the funds were taken may be entitled to a proportional part of the policy proceeds or limited to the amount of premiums paid with misappropriated funds. I agree with the Louisiana court's finding in Succession of Onorato, 219 La. 1, 51 So.2d 804 (1951) that by limiting the amount recoverable to the premiums actually paid with the stolen funds, "the fraud is made ineffective, equity and justice are served, and the public good and the policy of the statute creating the exemption are in no way impaired since the family and loved ones of the insured are assured of the proceeds that the misappropriated money bought." Onorato, 51 So.2d at 813.
In any fraud case, fraud is difficult to prove. The complaining party carries the burden of showing fraud by clear and convincing evidence. Bryan v. Holzer, 589 So.2d 648, 659 (Miss. 1991). In this case, the burden is still heavier. It is not enough just to show that funds were embezzled from the trust account, but rather, Ellen must show that those funds were used to pay the premiums for the policy taken out on her cousins' behalf. Thus, contrary to the majority's finding that the burden of proof was on Ellen's cousins to show what, if any, funds other than those stolen from the trust were used to pay the insurance premiums, the burden should be on Ellen to show the extent to which fraudulently procured funds to purchase her uncle's insurance policy at the time the policy was taken out, as opposed to when various premiums were paid. Ellen, however, has failed to show that specific funds were taken from the trust, and not from Buster Lackey's land or cattle operations, were used to pay the initial policy premium.
For these reasons, I respectfully dissent.