149 So.2d 781

**FIRST NATIONAL BANK OF MOBILE, Edwin C. Wilcox, d/b/a Edwin C. Wilcox Company and Harold Donald Percy**

v.

**Lavada H. POPE.**

**I Div. 944, 945, 946.**

Supreme Court of Alabama.

Feb. 7, 1963.

Sam M. Johnston and Johnston & Johnston, Mobile, for First National Bank and Percy.

Caffey, Gallalee & Caffey, Mobile, for Wilcox.

Thornton & McGowin, Mobile, for appellee.

MERRILL, Justice.

The original bill of complaint alleged the procurement of money from the complainant, The First National Bank of Mobile, by Douglas H. Pope, deceased, by the exercise of fraud and the investment by Pope of some of the money so fraudulently obtained in the payment of premiums on life insurance policies totaling $80,000, payable to his wife, Lavada H. Pope, and the use by Pope of some of the money as payment of the purchase price of a homestead, which passed on his death to his wife.

Lavada H. Pope, Edwin C. Wilcox, Harold Donald Percy and The Merchants National Bank of Mobile were made respondents to the bill. The bill alleged that Wilcox and Percy each claimed an interest in the proceeds of the insurance policies and in the real property purchased as a homestead.

The bill prayed that the claims of all parties to the suit in and to the proceeds of the insurance policies and in and to the real property acquired as a homestead be determined and enforced.

Wilcox and Percy each filed an answer which was made a cross bill wherein substantially all of the allegations of the com-

plaint were admitted except those to the effect that all of the premiums on the insurance policies and all payments on the homestead were paid from money fraudulently obtained from the complainant bank.

Each of the cross-complainants alleged that a portion of the premiums paid on the insurance policies and some of the payments on the homestead came from moneys fraudulently obtained by Pope from him.

The demurrer interposed by the respondent Lavada H. Pope to the original bill and the demurrers interposed by her to each of the cross bills were sustained.

The complainant and each of the cross-complainants appealed to this court. We affirmed. First National Bank of Mobile v. Pope, 270 Ala. 202, 117 So.2d 174.

The complainant and cross-complainants were given the right to amend and on return of the case to the circuit court the complainant bank amended its bill and each of the cross-complainants amended his cross bill. Demurrers interposed by Lavada H. Pope were sustained to the complaint as thus amended and to each of the amended cross bills. The complainant and the cross-complainants again amended their respective pleadings. The trial court thereafter sustained demurrer of Lavada H. Pope to the complaint as last amended and sustained her demurrers to the respective cross bills of Wilcox and Percy as last amended and dismissed the bill as last amended and each of the cross bills as last amended. From that decree, the complainant and the cross-complainants have appealed.

■ We are required by statute, Tit. 13, § 28, Code 1940, to review the case anew without regard to the former decision. Lucas v. Lucas, 258 Ala. 515, 64 So.2d 70.

■ The averments added by way of amendments following the decision on the first appeal seek to show that a fiduciary relationship existed between the appellants and Douglas H. Pope at the time he secured the loans from the appellants. These added

averments, however, are not sufficient to show that relationship except by way of conclusion. The complaint and the cross-complaints, as last amended, when construed most strongly against the pleaders, simply show a relationship of lender and borrower. That relationship is not a fiduciary one. See Restatement Second, Trusts, § 12b; Downey v. Humphreys, 102 Cal.App. 2d 323, 227 P.2d 484; Higgins v. Chicago Title & Trust Co., 312 Ill. 11, 143 N.E. 482.

■ On first appeal, the "fictitious collateral" offered by Pope was not particularly described but the amended bill shows that he merely signed demand notes payable, with interest, to The First National Bank of Mobile, hereinafter called "the Bank," and produced fictitious invoices representing sales of flour or other commodities to some dealer outside of Mobile, which flour was then supposed to be in transit to the buyer and the buyer was supposed to pay for the flour within thirty days.

Collateral security is defined as a "security given in addition to the direct security, and subordinate to it, intended to guarantee its validity or convertibility or insure its performance; so that, if the direct security fails, the creditor may fall back upon the collateral security. * * * Collateral security, in bank phraseology, means some security additional to the personal obligation of the borrower." Black's Law Dictionary, Fourth Edition.

The so-called collateral described in the amended bill did not meet the requirements of the definition. Even if the invoices had been genuine, the Bank would have had nothing to "fall back upon" if the notes were not paid because the Bank had no claim on any of the named purchasers from Pope.

Construing the averments of the amended bill more strongly against the pleader, it becomes apparent that the Bank did not rely on this so-called "collateral security," but upon Pope's false representations that he

was financially worth more than he actually was, and was making more sales than he actually was. We further note that the pleadings show a continuous series of loans from the Bank to Pope over a period of nine and one-half years but no payments on any notes are alleged except as to the first note of $5,000 at the beginning of his business with the Bank in 1949, yet in that period of time, his indebtedness to it grew from zero to over $175,000.

The Bank argues here, as on the first appeal, that a constructive trust was created in the proceeds of the insurance and in the homestead in its favor because of the false representations of Pope as to his worth and the amount of business he was doing when he signed the demand notes.

On first appeal, we discussed every case cited to us by appellants to support the application of a constructive trust to the facts. Those cases were: Truelsch v. Northwestern Mut. L. Ins. Co., 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914; Vorlander v. Keyes, 8 Cir., 1 F.2d 67; Massachusetts Bonding & Ins. Co. v. Josselyn, 224 Mich. 159, 194 N.W. 548; Dayton v. H. B. Claflin Co., 19 App.Div. 120, 45 N.Y.S. 1005; Shaler v. Trowbridge, 28 N.J.Eq. 595; Holmes v. Gilman, 138 N.Y. 369, 34 N.E. 205, 20 L.R.A. 566; Brown v. New York Life Ins. Co., 9 Cir., 152 F.2d 246; Jansen v. Tyler, 151 Or. 268, 47 P.2d 969, 49 P.2d 372; Succession of Onorato, 219 La. 1, 51 So.2d 804, 24 A.L.R.2d 656; Exchange State Bank v. Poindexter, 137 Kan. 101, 19 P.2d 705. These cases fall within one or more of the following classifications:

(1) Where the wrongdoer occupied a fiduciary relationship to the owner of the money;

(2) Where the money or property was taken by a thief or embezzler;

(3) Where a certain use, agreed to in writing, was to be made of the money received but it was used for different purposes;

(4) Where the wife participated in or had knowledge of her husband's fraud.

We said on the first appeal, and that was the crux of our holding:

"We have not been cited to, nor have we found, any case factually in point with the one under consideration, but since there was no embezzlement, theft or misappropriation on the part of Douglas Pope, and no alleged complicity or knowledge on the part of his widow, we are unwilling to apply the cited authorities to the facts in the instant case."

We also stated that Pomeroy, § 1053, had been quoted in certain of our cases, but that in each instance, the wrongdoer had been in a fiduciary relationship to the person seeking to establish the trust. This is not to hold that § 1053 is limited to cases involving a fiduciary relationship and is not to be so construed.

In our opinion on first appeal, we were content to affirm the decree of the lower court because no case had been cited to us which met the facts of the case before us. However, on this appeal, we have found cases which do support the decree.

The main question is whether the facts show a constructive trust as between the borrower and the lender, when the fraud is limited to false representations by the borrower as to his worth or his accounts receivable.

We discuss three cases where the only fraud consisted of false representations made by a bank when it was the borrower. As pointed out in the cases, the relationship of a bank with a general depositor is that of debtor and creditor.

In Venner v. Cox, (Tenn.Ch.App.), 35 S.W. 769, the plaintiff, a regular depositor, heard rumors of the bank's unsound condition and, five days before it closed, he presented his check for the balance of his account. The president told him the bank was entirely solvent and safe, showed him

the latest government report on the bank, and all these statements were false and fraudulent and known by the president to be so at that time, "and by these false and fraudulent representations he quieted the apprehensions of complainant, and induced him to destroy his said check, drawn by him and presented as aforesaid, and to let his money remain in said bank." But for these false and fraudulent representations, complainant would have had his money before the bank failed. Complainant sought to have a constructive trust established on the money of the bank in the hands of the receiver. The demurrer to the bill was sustained. On appeal, the decree was affirmed, and the court, after quoting Story and Perry on Trusts, and stating the principle "that, where a party obtains the property of another by fraud, he will be held to be a trustee for the owner," said:

"* * * But this case is one simply of creditor and debtor, wherein the debtor, by a series of egregious lies as to his solvency and ability to pay his debts, induces his creditor to forbear pressing the payment of his demand, and to continue his creditor. If such misrepresentations operate in equity to divest title to property, and to convert debtors into trustees for their creditors, we apprehend that the field of trust estates will be immensely enlarged. Such a principle would ultimately constitute a serious obstruction to trade and commerce. The principle cited from Story and Perry, copied above, has no application, as we understand it, to a set of facts involving the mere relation of creditor and debtor. The decree of the chancellor is supported as to the point in issue, we think, by the authorities of this state and others."

In State ex rel. Rankin v. Montana Banking Corporation, 77 Mont. 134, 251 P. 151, where plaintiff Mitchell relied on false and fraudulent representations of the president of the bank, who knew them to be false, as to its solvency and lost deposits of $44,000

belonging to himself and two others, the court said:

"* * * The appellants, when the representations were made, were and had been for many years general depositors. The relation of a bank with a general depositor is that of debtor and creditor. * * * It would be a strange doctrine that would permit a creditor to impress his debtor's property with a trust simply because, when the creditor attempted to collect the debt, the debtor falsely represented his ability to pay and thereby obtained forbearance."

In Fagan v. Whidden, 5th Cir., 57 F.2d 631, A. J. Whidden, deceased, had been a customer of the First National Bank of Avon Park, Florida, for many years, carrying deposits in both general and savings accounts with it. He was adjudged insane, and his guardians inquired whether Whidden had a savings account. They were told by an official of the bank that he had none, when in fact he had a savings account of over $8,000, and the bank official knew that his statement to the guardians was false. Whidden died within a month and the bank failed one year later.

The guardians sought to fix a constructive trust on so much of the bank's funds as to cover the savings account, because of the fraudulent concealment, for the reason that, had they known of the existence of the account, they would have withdrawn it for deposit in the designated depository and distribution under Whidden's will. The lower court held that a trust had been created.

The court, speaking through Judge Hutcheson, dismissed the bill and said:

"That the officers of the bank have acted badly, and that for the damage caused by their fraudulent conduct they may be held personally to account, goes without saying. It is quite another thing, however, to say that the fraud of an officer of the bank, by which a depositor is prevented from carrying

out a purpose to cease being a creditor of the bank converts him from a creditor of the bank into an owner of a specific amount of the bank's funds so that thereafter the bank is, as to that amount, not his debtor, but his trustee.

\*   \*   \*   \*   \*   \*

"Attractive in its appeal and salutary in its operation as is the doctrine that equity will convert into a trustee ex maleficio one who has acquired property of another, and unlawfully converted it to his own use contrary to agreement, express or implied, *it is essential to its application that the property of one has been so misapplied by another.* \* \* \* All that has been shown here is that the deceased loaned money to the bank on a savings account. Not only has no agreement changing the status of the account from a general to a special deposit been shown, but the testimony prevents the finding that appellees and the bank arrived at such an agreement as to it, for it shows that its very existence was, by denial, concealed from appellees. *The fact of this deceit cannot change appellees from creditors of the bank to owners of its funds. The bank stands as to them just as it does to its other creditors, their debtor, not their trustee.* Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873. (Emphasis supplied).

"The judgment is reversed, with directions to dismiss the bill."

In the instant case, Pope was a debtor of the bank but he did not misapply the property of the bank, which was essential to establish a constructive trust since he was not an embezzler or a thief or in a fiduciary capacity. Pope made no agreement to use the money in any way, title to it passed to him to use as he saw fit and the bank never, at any time after the loans were made, had title to the money. The fact of Pope's deceit cannot change the bank from a creditor to the owner of his funds, much less funds of his wife. Pope stands as to the bank just as he did to his other creditors, their debtor, not their trustee.

■ A debt is not a trust and there is no fiduciary relationship between debtor and creditor as such. If a person receives money and it is the intention that he shall have the unrestricted use thereof, a debt is created. Downey v. Humphreys, 102 Cal. App.2d 323, 227 P.2d 484.

In Scott on Trusts, 2nd Ed., Vol. I, § 12.1, it is said:

"There is a fiduciary relation between trustee and beneficiary but not between debtor and creditor as such. Accordingly, a trustee cannot properly purchase the interest of the beneficiary without making full disclosure to him of all relevant facts which are known or ought to be known to the trustee, and the transaction must be a fair bargain; while a debtor deals with his creditor at arm's length, and an agreement between them for the extinguishment of the debt will not be set aside merely because of the failure of the debtor to make disclosure or merely because the bargain was not a fair one."

It is also stated by Scott, in § 12.2, p. 105: "The fact that the person receiving the money agrees to pay interest is strong evidence that the parties intended to create a debt and not a trust. It is not natural for anyone to agree to pay interest on money unless he is entitled to use that money as his own."

In Restatement of the Law of Trusts, 2d, § 12g, it is stated: "If there is an understanding between the parties that the person to whom money is paid shall pay 'interest' thereon (at a fixed or at the current rate, and not merely such interest as the money, being invested, may earn) the relationship is practically always a debt and not a trust. Interest is paid for the use of the money, and if the payee pays interest he is, in the absence of a definite under-

standing to the contrary, entitled to use the money for his own purposes."

Interest is the price or consideration for the use of money, and the borrower who pays interest is a debtor and not a trustee. Pittsburg National Bank of Commerce v. McMurray, 98 Pa. 538.

Again, the allegations and exhibits of the amended bill merely show a relationship of debtor-creditor between Pope and the Bank. The Bank alleges it loaned Pope money continuously over a period of nine years, charged him interest on that money, never required any security for any of the loans although the debt steadily increased to $180,000, and there was no agreement or contract as to how this borrowed money was to be used, and Pope was entitled to use it as his own. Under these conditions, we cannot hold that a constructive trust was created, because Pope was a debtor and at no time became a trustee of the Bank; and the Bank did not become dissatisfied with its business relationship with him until after his death.

It is settled in this State that fraud alone is not a distinctive ground for equitable jurisprudence. Bullard Shoals Mining Co. v. Spencer, 208 Ala. 663, 95 So. 1; Gewin v. Shields, 167 Ala. 593, 52 So. 887; Merritt v. Ehrman, 116 Ala. 278, 22 So. 514; Smith Ex'r v. Cockrell, 66 Ala. 64.

In Butts v. Cooper, 152 Ala. 375, 44 So. 616, the elder Simpson, J., speaking for the court, made this concise statement: "A constructive trust arises when one person, occupying a fiduciary position, or having placed himself in such position in relation to another that good faith requires him to act for the other and not himself, acquires the title to the property in himself, in place of in the cestui que trust."

Here, Pope acquired title to the money when he borrowed it from the Bank, and he paid a valuable consideration for it. He did not occupy a fiduciary position to the Bank and good faith did not require him to make any particular use of the money. It was his to do with as he saw fit, and he was not a trustee nor was there a cestui que trust.

We conclude that the allegations of the amended bill do not show a constructive trust. This also applies to the appeals of cross-complainants Wilcox and Percy, and disposes of the question of the homestead. This conclusion actually decides the case, but, because of an erroneous citation in the original opinion, we think the aspect of the proceeds of the insurance requires some explanation.

In the original opinion in 270 Ala. 202, 117 So.2d 174, we said in the fifth from last paragraph that "the beneficiary of the insurance policy is protected by Tit. 57, § 29, Code 1940." That citation should have been Tit. 7, § 624, Code 1940, which reads in pertinent part: " * * * the husband or father may insure his life for the benefit of his wife * * *, and the proceeds and avails thereof, whether or not the right to change the beneficiary is reserved or permitted, is exempt from liability for his debts or engagements or for his torts or any penalty or damages recoverable of him."

The first exemption statute was enacted in New York in 1840 and the statutes of other states, including Alabama, have followed those of New York. Our first statute was codified in the Code of 1867. In 1886, the exemption was all insurance if the annual premiums did not exceed $500, and if they did exceed that amount, then all the insurance was exempt which the annual premium of $500 would purchase as an ordinary life policy. In 1907, the amount was raised to $750; in 1923, to $1,000, and in 1932, we copied the 1927 statute of New York and removed all limitations on the amount of premiums, so that the wife or children could receive as exempt all the proceeds of policies in which they were named as beneficiaries.

No case has been cited to us where the widow has lost the proceeds of insurance exempted by a statute where the relation of

lender-borrower existed between the lender and her husband, and there was no complicity or knowledge of any fraud on the part of the widow.

A case in point is Harriman Nat. Bank v. Huiet, 4th Cir., 249 F. 856, where the court held that the fact that a husband obtained money by false representations with which to pay premiums on life insurance policies payable to his wife did not render the proceeds of such policies subject to the claims of his creditors, where the proceeds were exempted by statute and the wife was not a party to the fraud. In that case, the bank sought to subject the proceeds of certain life insurance policies on the life of Caleb B. Huiet, an insolvent decedent, to the payment of certain debts. Huiet was a broker and became insolvent on March 31, 1914. On that day, he made a false financial statement to the bank showing himself to be a man of wealth, and by virtue of such false and fraudulent statements, the bank made two loans, without security, to him of $15,000 each. At that time, Huiet was investing heavily in life insurance, payable to his wife, and when he died, on April 8, 1916, the face value of the insurance policies amounted to $215,000. Huiet lived in South Carolina and the statute of that State exempted to the wife or children the proceeds of insurance so long as the premiums paid in any one year did not exceed $500, but the excess premiums and the interest thereon enured to the benefit of his creditors. The court held that the wife was entitled to the face value of the policies and the amount of the premiums up to $500 a year. It held that the bank was entitled to the amount of the premiums in excess of $500 and the interest thereon. The court said:

"It is expressly denied by Mrs. Huiet that she had any knowledge of the alleged fraudulent transactions of her husband, or that she entered into any conspiracy with him to defraud his creditors, and there is not a scintilla of evidence to contradict this averment. However, it is insisted by plaintiff that the decedent by false and fraudulent representations secured the money from appellant with which to purchase the insurance in question. The court below found as a fact, as we have already stated, that all the premiums paid for insurance by the husband, with one exception, were paid anterior to the time that he became insolvent, and we think the evidence amply justifies this finding. However, we fail to see how any fraudulent and false representations the decedent may have made to appellant to obtain money could affect the right of the wife to enjoy the benefit of the exemptions to which she was entitled under a legislative grant."

In the instant case, the bank made loans to Pope continuously over a period of nine years, without security, either upon his note or by virtue of his false representations as to his wealth. But the loans and transactions were made without the knowledge, participation or complicity on the part of Mrs. Pope, the beneficiary of the insurance policies. Since our statute, Tit. 7, § 624, no longer places a limitation on the amount of yearly premiums, we think the statute plainly exempts the proceeds of the policies under consideration. Other cases holding similarly are: Kittel v. Domeyer, 70 App.Div. 134, 75 N.Y.S. 150; Chatham Phenix Nat. Bank & Trust Co. v. Crosney, 251 N.Y. 189, 167 N.E. 217; Penn. Mut. Life Ins. Co. v. Miller, D.C., 32 F.Supp. 206.

In San Jacinto Bldg., Inc. v. Brown, (Tex.Civ.App.), 79 S.W.2d 164, the husband gave his note for $2,743.40 to the complainant to cover rents. He had three life insurance policies totaling $25,000 on which his annual premiums were in excess of $500 per annum. His wife was the beneficiary of the policies. The husband and wife were injured in an automobile collision on December 13, 1932. The husband died that day, the wife the next day.

The complainant contended that the husband was insolvent when he took out the

policies and the payment of the premiums was in fraud of his creditors and with the fraudulent intent and purpose of defrauding his creditors. The demurrer to the bill was sustained and the creditor appealed.

The Court of Civil Appeals of Texas held (1) that the proceeds of insurance policies taken out by the husband on his life for the benefit of his wife, upon his death, became the property of the wife free from liability for the debts of her husband; (2) that the complainant did not allege that either the wife, the beneficiary, or the insurance companies issuing the policies were parties to the alleged fraud or that she or the companies knew of his alleged fraudulent intent; (3) before the creditor could avoid the contracts of insurance "it was incumbent upon it to show that there was fraud in the formation of the contracts, and that Mrs. Ronaldson (the wife) and the insurance companies, all being parties to the contracts, were parties to the fraud and participated in such fraud;" (4) there is no statute in Texas limiting or regulating the amount one may spend out of his receipts for the payment of premiums on life insurance policies, nor that would render such payments transfers of property in fraud of creditors. The judgment of the lower court sustaining the demurrer was affirmed and the bill was dismissed.

In the instant case, no fraud is charged to Mrs. Pope or to any of the insurors.

This court considered the progenitor of Tit. 7, § 624, which was § 4502, Code of 1907, in Kimball v. Cunningham Hardware Co., 192 Ala. 223, 68 So. 309. There, Kimball's creditors sought to charge the $55,000 proceeds of his insurance payable to his wife as beneficiary, with his debts, showing that he was insolvent at the time of his death and that he had been so for some time prior thereto, and that his estate was wholly insolvent. It was argued that the proceeds were subject to the debts under § 4287, Code 1907 (now Tit. 20, § 1, Code 1940), which reads:

"All deeds of gift, all conveyances, transfers, and assignments, verbal or written, of goods, chattels, or things in action, made in trust for the use of the person making the same, are void against creditors, existing or subsequent, of such person."

This court said:

"Our pure exemption statutes, and particularly the statute as to exemptions in favor of the wife and children against the creditors of the husband or father, must be construed in pari materia with the statutes as to frauds and perjuries and fraudulent conveyances. This has been repeatedly held, and, if a case falls within the exemption statutes, then it is not within, but is taken out of, the influence of the statute (section 4287) (now Tit. 20, § 1). This has been repeatedly decided, as to both personalty and realty which is exempt, but which is conveyed with a reservation of benefit to the grantor, or in trust for the use of the debtor.

\*   \*   \*   \*   \*   \*

"The object of statutes like ours, and their effect upon the various policies of life insurance, such as straight life, tontine, and those containing provisions to pay the insured, at stipulated periods, certain amounts, as the cash, or surrender, value of the policy, when the wife or the children are the beneficiaries, have been before the courts often, and the decisions are almost uniform in protecting the interests of the wife, children, or other dependents against the claims of creditors, if the case could, by liberal construction, be brought within the protection of the exemption statutes. \* \* \*"

When our statute exempting the proceeds of life insurance to the widow was limited to premiums of $500 (in 1888) and the lender secured a judgment on notes of the borrower which antedated the payment of the annual premiums, and it was charged that the premiums paid, less than $500, were voluntary and "null and void" as against the lender, this court said, per the elder

Coleman, J.: "The creditors of Arnold Stoutz, the husband, have no claim upon the insurance money, the proceeds of the policy taken out for the benefit of the wife. This money belongs to her in her absolute right, and she had the power to expend it as she saw proper." The demurrer to the bill was sustained. Craft & Co. v. Stoutz, 95 Ala. 245, 10 So. 647.

Chief Justice Stone stated the attitude of our court on the question of exemptions in Pinkus v. Bamberger, 99 Ala. 266, 13 So. 578. There, the statute in question was the progenitor of Tit. 7, § 629, which provided then, as now, for the exemption of $1,000 personalty from levy, sale or other process for the collection of debt. This court held the property selected by the defendant to be exempt and said:

"* * * No matter how fraudulent his conduct and intention may have been, if he was a resident of Alabama, he was entitled to have set apart to him as exempt from his debts $1,000 in value of his personal property, to be selected by him. * * *" To the same effect, see Young v. Brock, 164 Ala. 288, 51 So. 315.

If it be our policy to protect the personal exemption to the perpetrator of a fraud, all the more so should we protect a widow's statutory exemption when it is not even pretended that she had any knowledge of any wrongdoing of her husband or any complicity in it.

It follows that the appellee, as beneficiary of the insurance policies of her husband, was protected by the provisions of Tit. 7, § 624, Code 1940.

To summarize—we held in the original opinion and we again hold that under the facts of this case, where the relationship of lender-borrower existed for more than nine years of continuous business dealings, and the borrower made false representations as to his worth to the lender, and used part of the money borrowed to pay premiums on life insurance policies payable to his wife as beneficiary, or to purchase a homestead owned by the borrower and his wife, which passed to the wife at his death, but where there was no fiduciary relationship between the lender and the borrower, and no theft, embezzlement, conversion, misapplication or misappropriation of the funds of the lender by the borrower, or any knowledge or complicity on the part of the wife, no constructive trust arose and our statutes exempting proceeds of life insurance to the widow prevent the lender from subjecting the exempt property to the payment of the borrower's debts.

It follows that the demurrer to the amended bill was properly sustained.

We think the two cases dealing with constructive trusts cited in the dissenting opinion can be distinguished from the instant case. In Sliger v. Sliger, 21 Tenn. App. 64, 105 S.W.2d 117, Sliger and wife borrowed $2000 from The Federal Land Bank under an agreement by which they promised in writing to use $750 to build a dwelling, $650 to pay the balance owed on the land, $500 to pay personal debts and $100 to pay for stock in the National Farm Loan Association. The opinion in the Sliger case sets out the Federal statutes which show that such loans can be made for only certain purchases, and the application and the deed of trust showed they were to be used for the purposes enumerated, which were permissible under the statutes.

Instead, Sliger loaned $800 of the money to one Allen, who gave a mortgage on certain lands to Sliger and his wife as security. Later, the Sligers were divorced and Mrs. Sliger contended that the Federal Land Bank had no right to follow any part of the $2000 which had been loaned to Allen. The court held that the money was loaned to Sliger for certain purposes and when he did not so use the money, "its diversion was illegal and a fraud on the land bank." The court also said that "Mrs. Sliger signed the application and the deed of trust and she owes the debt to the land bank. She is bound to the bank, and is not

in any event entitled to the proceeds of the Allen mortgage as against the land bank."

The factual differences are great between the Sliger case and the instant case. There, the Sligers had promised to use the borrowed money in certain ways. Mrs. Sliger was a party to the agreement, knowing and making the promises as to the specified use of the borrowed money. The mortgage, or deed of trust, from Allen was made to Sliger and his wife. She was a party to the misapplication of the borrowed money. In the instant case, Mrs. Pope borrowed nothing, agreed to nothing, made no use of any of the borrowed money and had no knowledge of the transactions over a period of nine years. We cannot agree that a statement of law in the Sliger case under its facts should be controlling here.

The other cited case is Summers v. Summers, 218 Ala. 420, 118 So. 912. There the son, Robert, thirty-three years of age, agreed with his mother, Dora, in 1913, that he would secure a life insurance policy on his life, naming his mother beneficiary, and that she should remain the sole beneficiary provided she paid all the premiums on the policy; that she was to have possession of the policy, and the son delivered the policy to her. She paid all the premiums and kept the policy until the death of her son in 1926. In 1916, the son married Hannah, and in 1918, he made a false affidavit that the original policy had been lost and he requested that a substitute policy be issued to him and that his wife Hannah be named beneficiary in the substituted policy. The mother continued to pay the premiums and when the son died, his wife sought to collect on the substituted policy, while the mother sought to collect on the original policy which she still had in her possession.

In addition to the allegations of amended paragraph 13, set out in the report of the case, the original record shows other allegations that both the son and his wife knew that the mother was paying the premiums and had paid all of them, and they also knew she had the original policy in her possession.

Although the mother paid all the premiums because she relied on the promise of her son that she would receive the proceeds of the policy, and notwithstanding the fraud perpetrated on her, this court said the mother was entitled to have a trust impressed upon the proceeds of the policy only to the extent of the premiums paid with interest thereon.

We think the Summers case is distinguished from the instant case in these respects:

(1) The son and wife never paid any consideration for the policy during the thirteen years it was in force. Here, Pope paid a consideration (interest) for every loan he secured.

(2) Under the agreement, the mother was to have the beneficial interest in the proceeds of the policy because she was paying the premiums. Here, Pope owned all the title to the borrowed money and it was his to do with as he chose.

(3) The false affidavit to secure the issuance of the substituted policy destroyed the indicia of ownership held by the mother in the form of the original policy. Here, no action of Pope altered or changed any of his many notes to the Bank. They were just as valid after nine years as they were when they were executed.

(4) In Summers, the allegations show knowledge and complicity on the part of the wife in the fraud. No complicity in any fraud is shown on the part of Mrs. Pope.

(5) There was a per se confidential relationship between mother and son, whereas, the Bank and Pope were dealing at arm's length.

(6) There was a duty on the son to deal with the property (insurance) for the benefit of his mother, while Pope was never at any time under a duty to use the borrowed money for the benefit of the Bank. He could have given it away, burned it or buried it because he was not holding it for the benefit of the Bank.

Lenders generally require borrowers to furnish financial statements at regular intervals. We do not think that it was ever intended that the doctrine of constructive trusts should apply to borrowed money or its product merely because the borrower made an incorrect or false claim of assets in his financial statement filed with the lender.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, COLEMAN and HARWOOD, JJ., concur.

LAWSON and GOODWYN, JJ., dissent.

LAWSON, Justice (dissenting).

I am constrained to dissent because I am convinced that we erred in our opinion on former appeal and that the court in this case is perpetuating that error.

The complainant and cross complainants base their right to relief on the principle that:

"Whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealment, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property in the hands of the original wrongdoer or in the hands of a subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved of the trust."—4 Pom.Eq. Jurisprudence, § 1053, p. 119.

Of the quotation from Pomeroy set out above, we said on the first appeal:

"We have found this quotation in five of our cases, each of which discloses a fiduciary relationship, in which the person practicing the fraud took title to land in himself and claimed antagonistically to the party who, in equity, should have had the title. (Cases cited)

\* \* \* \* \* \*

"Thus, every time the quotation has been approved in our cases, it has been in a case where a fiduciary relationship, and not that of lender and borrower, prevailed. No such fiduciary relationship is shown between Douglas Pope and any of the appellants." (270 Ala. 207–208, 117 So.2d 174, 179)

The court's opinion on the second appeal says, in effect, that the language quoted above does not constitute a holding that a constructive trust arises only where a fiduciary relationship is disclosed. But despite this categorical statement, the opinion, as I understand it, is replete with other statements which indicate that such a relationship is necessary in order for a court of equity to proceed on the theory of a constructive trust.

A fiduciary relationship is not essential to the establishment of a constructive trust.— Restatement of Restitution, § 160, Comment a; Bolin v. Fines, 51 Neb. 650, 71 N.W. 293; Lady Ensley Coal, Iron & R. Co. v. Gordon, 155 Ala. 528, 46 So. 983.

The rule is stated in 4 Scott on Trusts, 2d Ed., § 462.1, p. 3104, as follows:

"An express trust is a fiduciary relationship with respect to property, arising as a result of a manifestation of an intention to create it and subjecting the person in whom the title is fixed to equitable duties to deal with it for the benefit of others. On the other hand, a constructive trust arises where

a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. In both cases the person who has the title to the property is under an equitable duty to deal with it for the benefit of another person. To this extent the two types of trust are similar. In other respects, however, they differ. An express trust arises because the parties intended to create it. A constructive trust is not based on the intention of the parties but is imposed in order to prevent one of them from being unjustly enriched at the expense of the other. In the case of an express trust the trustee ordinarily has active duties of management. In the case of a constructive trust, the duty is merely to surrender the property. *A constructive trust, unlike an express trust, is not a fiduciary relation. The circumstances which give rise to a constructive trust may, but do not necessarily, involve a fiduciary relation.*" (Emphasis supplied)

It seems to be well established that where a constructive trust is shown, the cestui que trust can follow the trust funds and appropriate to himself the property into which such funds have been changed provided the trust fund can be clearly ascertained, traced and identified and provided the rights of bona fide purchasers for value without notice have not intervened.—4 Scott on Trusts, 2d Ed., §§ 507, 508, 508.1; Restatement of Restitution, § 202, p. 818.

In 4 Scott on Trusts, § 508.1, at pp. 3252, 3254–3255, it is said:

"§ 508.1. Kinds of wrongdoers. The principle under which the claimant is entitled to follow his property into its product is applied to all kinds of conscious wrongdoers. It is applied to trustees and to fiduciaries, *to persons who have obtained property by fraud,* duress or undue influence, and to those who have converted the property of others.

\* \* \* \* \* \*

"*Persons obtaining property by fraud or duress.* The principle is applicable also where a person wrongfully acquires title to property and exchanges it for other property, even though he is not in a fiduciary relation to his victim. Thus it is applicable where property is acquired by fraud and is exchanged for other property. *If B obtains money by fraud from A and invests it in shares of stock, A is entitled to enforce a constructive trust of the shares or to enforce an equitable lien upon them \* \* \*.*" (Emphasis supplied)

In Sliger v. Sliger, 21 Tenn.App. 64, 105 S.W.2d 117, the court said in part as follows:

"Where a party makes false representations for the purpose of borrowing money and invests it in other lands or mortgages on other lands, a constructive trust is created." (105 S.W.2d 120)

On the first appeal, the appellants cited a number of cases from other jurisdictions which hold that where a person has embezzled, stolen or misappropriated funds of another and used them for the purpose of payment of premiums on insurance on his life, a trust is created in favor of the owner of the funds, and the owner is entitled to recover from the proceeds of the insurance policies.

I read the opinion on first appeal as holding that the holdings of the cited cases have no bearing on this case because they all dealt with embezzlement, theft or misappropriation of funds where title to the money did not pass from the true owner, whereas in this case the title did pass from the complainant and cross complainants to Douglas Pope.

Apparently this is a holding to the effect that a constructive trust cannot be enforced where the title to property has passed from the person defrauded to the person committing the fraud. If such is the holding it is, in my opinion, incorrect, as is pointed out in the quotations heretofore made from Scott and Pomeroy.

Actually, the principle of a constructive trust was applied in those cases not because title had not passed but because there had been a conversion of the funds into other property. In 4 Scott on Trusts, § 508.1, which deals with "kinds of wrongdoers," it is said on page 3255 as follows:

"Converters. The principle is applicable also to one who is a mere converter. A converter, it is true, is not a constructive trustee of the property converted. He acquires no title to the property and cannot pass title even to a bona fide purchaser. He is liable for the conversion in an action at law, and ordinarily a suit in equity cannot be maintained against him, since the remedy at law is adequate. But if the property is exchanged by the converter for other property, a different situation arises. In an action at law, the person whose property was converted can reach the product of his property only by attachment or levy of execution, and in so reaching it he stands in no better position than any other creditor. It is only just, however, that he should be permitted to reach the product of his property ahead of the general creditors of the wrongdoer. Accordingly, the courts have had no difficulty in holding that he is at least entitled to an equitable lien upon the product of the converted property * * *."

In regard to the so-called embezzlement, theft or misappropriation cases cited by appellants on the first appeal, we further observed:

"We are not to be understood by this opinion as approving or disapproving 'the majority rule' which the cases cited by appellants enunciate. That question, concerning the thief, embezzler, or accomplice, is not before us. We merely hold that those cases are not apt authority when applied to the facts in the instant case." (270 Ala. 208, 117 So.2d 180)

But this court long ago extended the rule of those cases to an instance where a person by fraudulent concealment was induced to pay out money on a mistaken assumption of an interest in an insurance policy.—Summers v. Summers, 218 Ala. 420, 118 So. 912.

The Summers Case, supra, was instituted by Dora Summers against the Grand Lodge of Brotherhood of Railroad Trainmen as the insurer of the life of her son, Robert F. Summers, deceased, and against Hanna B. Summers, his widow, as the illegally substituted beneficiary in his policy of insurance, for the purpose of enforcing complainant's asserted priority as the equitable owner of the proceeds of the policy. The insurance company paid the money due on the policy into court for the benefit of the party entitled to receive it and was released from further liability and discharged as a party respondent.

The widow of the insured, Hanna B. Summers, interposed a demurrer which was sustained and the bill was dismissed. The plaintiff, Dora Summers, appealed to this court.

A statement of the averments of the bill of complaint made by Judge Somerville and set out in the report of the case, but not in the opinion, reads as follows:

"Complainant shows that the policy was issued in November, 1913, and that she was named as the beneficiary therein; that from the date of issuance until the death of insured, in November, 1926, she paid all dues and assessments on the policy; that the insured married respondent, Hanna B. Summers, about the year 1916, and in 1918 he had a new policy issued in which his said wife was named as

beneficiary, of which complainant had no knowledge until after the death of the insured, and that the fact of complainant's said payments was known to the insured and to his wife, Hanna, who knew also that complainant had in her possession the original policy.

"By amended paragraph 13 it is alleged:

" 'That your oratrix has a vested interest in the first policy aforesaid set out; that the said Robert F. Summers at the time of the issuance of the first policy as aforesaid agreed with your oratrix that she should be and remain the sole beneficiary therein, during his lifetime, provided that she paid all dues and assessments thereon; that the said Robert F. Summers delivered possession of said policy to your oratrix in pursuance of said agreement and said possession has remained in the oratrix, of which defendant, Hanna B. Summers, *has notice;* that by reason thereof and by reason of the fulfillment of said contract and agreement on the part of your oratrix, the said Robert F. Summers was estopped from making any change in the beneficiary of said policy.'

"The bill also charges that—

"The substituted policy 'was issued upon false averments and allegations and in fraud of the vested interest of your oratrix under said first-mentioned policy, which said false averments * * * were material in procuring and obtaining said illegally substituted policy, as aforesaid.' "

The original opinion was prepared for the court by Judge Somerville and he affirmed.

The principles with which we are presently concerned were not treated at any length in the original opinion. The affirmance of the decree was based primarily on the provisions of § 8445 of the Code of 1923, which read:

"Within the above restrictions each member shall have the right to designate his beneficiary, and, from time to time, have the same changed in accordance with the laws, rules and regulations of the society, and no beneficiary shall have or obtain any vested interest in the said benefit until the same has become due and payable upon the death of the said member."

About the only reference in the original opinion to the allegations of fraud contained in the bill was this:

"As to the contention that complainant was defrauded by a false affidavit by means of which the insured effected the substitution of another beneficiary and secured the issuance of a new policy, as observed by Mr. Justice Sayre in McDonald v. McDonald, 212 Ala. 137, 141, 102 So. 38, 36 A.L.R. 761, if complainant had no vested interest in the policy, she could not have been defrauded, and, if she had such an interest, the alleged fraud could not have affected it; hence the imposition, if any, was upon the association alone, and, if the association waives it, no one else can complain. It was so declared in Slaughter v. Grand Lodge, etc., 192 Ala. 301, 305, 68 So. 367. See, also, to the same effect, Hoeft v. Supreme Lodge, etc., 113 Cal. 91, 45 P. 185, 33 L.R.A. 174; 4 Cooley's Briefs on Insurance, 372. The allegation of fraud in this behalf does not aid the bill."

An application for rehearing was filed. In the opinion prepared for the court on rehearing by Judge Foster, the rehearing was granted and the cause was reversed and remanded. In matters pertinent to this case, it was said:

"It is insisted that complainant has an equitable lien in the nature of a trust, because her money was wrongfully obtained with which the premiums were paid, citing Cooley's Briefs on Ins. vol. 7, p. 6492 (Ed. 1928). The

authorities cited there apply when trust funds are used by the insured to pay the premiums. It is upon the principle 'which allows a cestui que trust to follow trust funds, and to appropriate to himself the property into which such funds have been changed,' as where a partner wrongfully abstracts partnership funds, with which he pays premiums on a policy payable to his wife, Holmes v. Gilman, 138 N.Y. 369, 34 N.E. 205, 20 L.R.A. 566, 34 Am.St. Rep. 463; Dayton v. [H. B.] Claflin, 19 App.Div. 120, 45 N.Y.S. 1005; or where, 'the premiums were paid from funds stolen or embezzled,' Truelsch v. N. W. Mutual Life Ins. Co., 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914; Vorlander v. Keyes (C.C.A.), 1 F. (2d) 67; Mass. Bonding & Ins. Co. v. Josselyn, 224 Mich. 159, 194 N.W. 548; Anno. page 930, 38 A.L.R. There is no reason why this principle may not be extended to an instance where a person by fraudulent concealment is induced to pay out money on a mistaken assumption of an interest in the policy. By such concealment, a trust ex maleficio, *constructive* in nature, is created to the extent of the funds so paid. The effect of the transaction is that the insured obtained the funds of appellant by fraud, and they were used in paying the premiums on the policy sued on, thereby tracing such funds into said property. [Supreme Council] Royal Arcanum v. McKnight, 238 Ill. 349, 87 N.E. 299; Allen v. Cunningham, 143 Tenn. 11, 223 S.W. 450.

"In the case of Kent v. Dean, 128 Ala. 600, 30 So. 543, this court quotes from 2 Pom. Eq., §§ 1053, 1055, as follows:

" 'Whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealments [or etc.], or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same; * * * and a court of equity has jurisdiction to reach the property * * * until a purchaser of it in good faith, and without notice acquires a higher right.' (Authorities cited)

\* \* \* \* \* \*

"To create a constructive trust, 'actual fraud is not necessary; but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title.' 39 Cyc. 169.

" 'One who acquires land or other property by fraud, misrepresentation, concealment, or under any other circumstances which render it inequitable for him to retain it, is, in equity, regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property.' 39 Cyc. 172.

\* \* \* \* \* \*

"The bill may not be sufficient in its averment of fraud; but there was no ground of demurrer for such insufficiency. While the court will not consider the bill as amended to the extent of adding new matter in the nature of independent facts essential to be averred, it will, for the purpose of determining its equity, view the bill as if the matters stated were properly pleaded. Slaughter v. Grand Lodge, supra. While fraud is not sufficiently alleged, there is an allegation of fraud, and a general demurrer for want of equity should not be sustained, but to reach that defect the demurrer must specifically point it out. (Authorities cited)

"We hold, therefore, that the demurrer should not have been sustained, and that the bill has equity for the purpose of tracing appellant's funds alleged to have been fraudulently obtained, consisting of the payments of the premiums and interest from date of each payment, and of impressing upon the proceeds of the policy a trust to the extent of such funds so obtained with the interest thereon."

The amended complaint of Dora Summers is not, in my opinion, subject to the construction that it shows that Hanna B. Summers, the wife, had notice of the agreement to the effect that Dora Summers, the mother, would remain the sole beneficiary of the policy during the insured's lifetime provided Dora Summers paid all dues and assessments thereon. The bill merely alleges that Hanna B. Summers knew that Dora Summers paid the premiums and knew that the policy remained in the possession of Dora Summers.

In any event, the opinion on rehearing in the Summers Case makes no reference to such averments and the conclusion reached on rehearing was in no wise affected by those averments insofar as the opinion discloses. The opinion on rehearing simply applied the principle of the out-of-state cases cited in the opinion and the principle stated in § 1053 of Pomeroy's Equity Jurisprudence. The out-of-state cases relied upon in the opinion on rehearing in the Summers Case were pressed upon us on the first appeal and again on this appeal.

In the Summers Case, supra, we extended the principle of the cited out-of-state cases to an instance where a person by fraudulent concealment is induced to pay out money on a mistaken assumption of an interest in an insurance policy. I can see no rational basis for not applying the same rule to one who is induced to lend money on a fraudulent misrepresentation as to the borrower's financial status, since it is the policy of the law to discourage fraud in all its phases and especially actual fraud, which involves an intent criminal in its nature, always difficult of detection, furtive in its artifices and damaging in the dishonesty of its consequences. It is the universal maxim of the law, as it is of common honesty, that no one shall be permitted to build a legal right upon the basis of a legal wrong—that actual fraud can be the source and origin of no right which will be recognized by law.—Kitchell v. Jackson, 71 Ala. 556.

The court has cited a number of cases from other jurisdictions in support of its holding. I will not undertake to analyze or distinguish them. In my opinion, it is sufficient to say that they do not coincide with the holding of this court in the Summers Case, supra, which the court in the instant case has refused to follow.

In regard to the court's holding relative to § 624, Title 7, Code 1940, I call attention to the fact that it was apparently thought to have no application in the Summers Case. It was not referred to, no doubt, because the out-of-state cases cited and relied upon in that case held similar statutes no bar to the enforcement of a constructive trust under the facts of those cases.

The court's opinion, as I see it, places a stamp of approval upon fraud in business tranactions. I cannot agree.

I am of the opinion that the trial court erred in sustaining demurrer to the amended bill and to the amended cross bills and in dismissing them. I would reverse and remand.

GOODWYN, J., concurs in the dissenting opinion of LAWSON, J.