DONNA B. HILTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hilton v. Commissioner
Docket No. 20857-87
United States Tax Court
T.C. Memo 1990-379; 1990 Tax Ct. Memo LEXIS 397; 60 T.C.M. (CCH) 217; T.C.M. (RIA) 90379; July 24, 1990, Filed *397 Decision will be entered under Rule 155. Timothy W. Burgmeier and Eddy M. Quijano, for the petitioner. Susan S. Canavello, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in and additions to petitioner's individual Federal income tax for calendar year ending December 31, 1981, as follows: Additions to tax
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
$ 53,957.99
$ 2,697.90
*
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for taxable year 1981. All Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are (1) whether the statute of limitations operates to bar assessment and collection of the deficiency and additions to tax for 1981; if not, (2) whether petitioner qualifies for relief under section 66(c); and (3) whether petitioner is liable under section 6653(a)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the attached exhibits, are incorporated herein. Petitioner resided in Metairie, La., *398 at the time the petition was filed in this case. General Background
Petitioner graduated from high school but never attended college and, until March 1977, had always lived at home with her parents in Arabi, a small town just outside New Orleans, La. Petitioner was employed full-time from the time she graduated from high school until sometime in 1986. In 1977 petitioner was 22 years of age, and employed as a secretary with the Chamber of Commerce in New Orleans, La. In August 1977 she met Albert L. Hilton (herein referred to as "Mr. Hilton" or petitioner's "husband"), who was 32 years of age. In October 1977 they began dating. Petitioner thought Mr. Hilton was "fairly well off," since he owned a "comfortable" three-bedroom house in a "nice" neighborhood on La Place Street, Metairie, La., and a 1977 Pontiac Bonneville. Petitioner did not perceive it unusual that Mr. Hilton was financially secure since, in her opinion, he came from an upper middle class family. [1] Petitioner, however, was unaware that Mr. Hilton had been misappropriating money from T. L. James & Co., Inc. (herein "T. L. James"), since 1970. From 1967 until either late 1976 or early 1977 Mr. Hilton worked fulltime *399 for T. L. James. Thereafter, and for 14 months, Mr. Hilton worked for Kenner Marine. Sometime before March 1979 Mr. Hilton resumed working for T. L. James. Mr. Hilton's scheme was simple and very effective. He submitted to T. L. James fictitious invoices in the name of "Industrial Material Company," an unincorporated entity (herein "Industrial") he created solely to carry out his illegal scheme. T. L. James would pay those invoices by issuing a check to Industrial and mailing it to either a Post Office Box or 3011 White Street, Mr. Hilton's parents' home address. At all relevant times, T. L. James never mailed a check to the La Place Street residence. Mr. Hilton deposited the checks in the checking account he maintained under the name "Industrial Material Company" *400 with the National Bank of Commerce in Jefferson Parish, La. (herein "Industrial account"), account number 050-4618-1. At all relevant times, Mr. Hilton alone maintained the Industrial account. Petitioner neither knew the account existed, nor did she have any authority to write or sign checks on the account. Although Mr. Hilton embezzled money between 1970 and 1977 and lived a "comfortable" life, he did not live extravagantly. Rather than spending the misappropriated funds for luxury items, Mr. Hilton preferred to gamble and buy drinks for his friends. He did, however, keep some funds in the Industrial account, and used some to pay off the mortgage on his La Place Street residence. 1979
Sometime before March 1979 Mr. Hilton resumed working for T. L. James, [2] and in March 1979 married petitioner. [3] *401 Petitioner remained unaware of her husband's illegal activity. For their honeymoon, Mr. Hilton took petitioner on a seven-day trip to Paris, France, and London, England. The trip cost Mr. Hilton approximately $ 3,500. Petitioner neither knew, nor did Mr. Hilton tell her how much the honeymoon cost, or where he got the money to pay for it. After their return to the United States, petitioner resided at the La Place Street residence and remained there at all relevant times. Petitioner continued to work full-time at the Chamber of Commerce and was paid semi-monthly. Petitioner had little or no experience in managing a household, i.e., paying bills or maintaining records, since she had always lived with her parents. Thus, she placed her trust in and totally relied on her husband, who was 10 years older and more experienced, to handle all their financial matters. Sometime in 1979 or 1980 petitioner closed her individual savings account, [4] transferring the $ 10,000 contained therein to her husband. Later, they opened a joint checking account with The Commercial Bank & Trust Company (herein "Commercial"), account number 12-4719-0, in Metairie, La. [5] Petitioner had authority to write and sign checks on that account. Between January *402 1, 1981, and May 15, 1981, petitioner signed only 9 [6] of the 75 checks drawn on the Commercial account. Petitioner, however, never deposited any funds, including her paychecks, in that account. Instead she routinely cashed her paychecks, set aside enough cash to cover the household and her personal expenses, and gave any remaining cash to her husband to manage. Petitioner also had access to the check register, but Mr. Hilton never kept it balanced. Therefore, petitioner never knew how much money was in the account. If petitioner needed to write a check, she simply asked her husband if the account contained sufficient funds. Petitioner accepted his word that it did, and did not inquire any further. *403 Petitioner and Mr. Hilton also took a trip to Gatlinburg, Tenn., in 1979. During 1979 petitioner earned $ 10,045.82 in wages, while Mr. Hilton earned $ 16,100. Mr. Hilton also misappropriated approximately $ 7,900 from T. L. James. However, only their wage income was reported on their 1979 joint individual Federal income tax return. Mr. Hilton prepared the return and petitioner signed it. 1980
In 1980 Mr. Hilton purchased an antique car for $ 3,000. Although petitioner knew her husband intended to buy the car, she did not know how much it cost. Sometime in 1980 they took a seven-day trip to the Virgin Islands. The trip cost approximately $ 2,500. Betwen January 1, 1980, and December 31, 1980, Mr. Hilton misappropriated approximately $ 6,300 from T. L. James. At her husband's instruction, petitioner filed her 1980 Federal income tax return under the married filing separately status. Mr. Hilton told petitioner to file separately, since doing so would reduce their tax liability. Petitioner believed him and filed accordingly. Although Mr. Hilton prepared the return's figures, petitioner filled out the return and signed it. Mr. Hilton separately reported the $ 19,320 in wages he *404 received from T. L. James. He did not report the $ 6,300 misappropriated from T. L. James. 1981
During 1981 Mr. Hilton opened four accounts at Southern Savings Association (herein "Southern"). [7] Petitioner did not accompany her husband when he opened these accounts. Even though her name appeared on at least one of these accounts, petitioner was not aware that any accounts existed with Southern. In March 1981 Mr. Hilton purchased a 1981 Lincoln TownCar for $ 18,000, [8] financing $ 8,000 to $ 10,000. Although petitioner knew he planned to purchase the car she neither knew how much it cost, nor did she sign the financing papers. In May 1981 petitioner and Mr. Hilton opened a joint checking account with the Metairie Bank & Trust Company (herein "Metairie"). The account remained open through and after December 31, 1982. Petitioner had authority to write and sign checks on that account. Although petitioner had access to the check register she did not "maintain" it, since that was her husband's *405 responsibility. Mr. Hilton, however, did not keep the register balanced. Accordingly, petitioner never knew how much money was actually in the account at any given time. On May 8, 1981, Mr. Hilton withdrew $ 480 from the Industrial account and deposited those funds in the joint Commercial account (No. 12-4719-0). Sometime around May 1981 petitioner and her husband looked at a lot located in the Palm Vista subdivision of Jefferson Parish, La., where they planned to eventually build a home. [9] Both participated in discussions with the real estate agent and knew that the property cost $ 28,000. Mr. Hilton told petitioner they would borrow the $ 28,000. However, instead of borrowing the money, Mr. Hilton withdrew $ 28,500 from the Industrial account on May 21, 1981, and deposited it in the joint Metairie account. Petitioner was unaware of this transaction. At closing, May 22, 1981, Mr. Hilton wrote a $ 28,281.94 check on the Metairie account to pay for the Palm Vista lot. Although petitioner was present and signed the act of sale, she did not know that the check her husband wrote represented funds he had *406 misappropriated from T. L. James. Rather, she believed the funds were the proceeds of a loan he had obtained. On July 8, 1981, and October 14, 1981, Mr. Hilton withdrew a total of $ 1,000 from the Industrial account and deposited it in the joint Metairie account. In late October 1981 T. L. James laid Mr. Hilton off work. Petitioner was concerned about their not having enough money to pay all their bills, especially the loan she thought was taken out to purchase the Palm Vista property. Mr. Hilton, however, advised her that they had enough money saved to cover their expenses. Petitioner believed him. By October 31, 1981, Mr. Hilton had misappropriated $ 175,348.32 from T. L. James. [10] All funds were initially deposited into the Industrial account. On November 5, 1981, Mr. Hilton withdrew $ 19,000 from his Industrial account (check no. 812), and deposited it in Southern account number 13-04-25579-9. On November 30, 1981, Mr. Hilton withdrew $ 40,000 from the Industrial account (check no. 817), and either deposited it in one of the four existing Southern *407 accounts, or purchased a certificate of deposit, Southern account number 040926-677. On December 22, 1981, Mr. Hilton withdrew $ 500 from Industrial and deposited it in the joint Metairie account. [11] On December 23, 1981, petitioner and her husband purchased four adjoining lots of real property in Kenner Project, Jefferson Parish, La. for $ 28,000. They intended to build a rental warehouse. Petitioner and Mr. Hilton participated in the purchase negotiations. Again, however, Mr. Hilton told petitioner that the lots would be purchased with borrowed funds. She believed him. However, Mr. Hilton paid $ 17,796 of the purchase price with funds he had embezzled from T. L. James. Although petitioner was present and signed the act of sale she was not aware of the source of the funds used to pay for the property. She believed they were borrowed. Neither petitioner nor Mr. Hilton put any additional money into the Palm Vista or the Kenner *408 Project properties. They never built on them, never leased them, or used them as security for a loan. For Christmas 1981 Mr. Hilton gave petitioner a watch which cost him between $ 300 and $ 350. This was the only "expensive" gift petitioner ever received from Mr. Hilton. Between May 1981 and December 31, 1981, over 110 checks were drawn on the Metairie account. Petitioner, however, wrote only one, check number 197. The check, dated November 5, 1981, was made out to Dr. Cabacieras for $ 50. During 1981 petitioner and her husband took at least two trips: one to Gatlinburg, and one combined trip to Washington D.C., and Williamsburg, Va. They spent approximately $ 1,000 on the trip to Washington and Williamsburg. The hotel bills were paid by check and were not from the embezzled funds. In early 1982 Southern sent a Form 1099 to the La Place Street address for $ 2,969.24 interest earned on the Southern accounts. Petitioner did not see the Form 1099, or any of the Southern account statements even though the Form 1099 was in the names "Albert L. Hilton or Donna B. Hilton." Moreover, Mr. Hilton never told petitioner that the Southern accounts existed, or that they earned any interest *409 income in 1981. After Mr. Hilton was laid off from work, he discussed with petitioner his idea of starting a paper produce and janitorial service. Unknown to petitioner, Mr. Hilton's true intent was to provide himself with continued access to T. L. James in order to perpetuate the fictitious invoicing scheme he began in 1970. Petitioner, believing her husband really wanted an opportunity to own his own business, agreed that he should do so. On January 5, 1982, Mr. Hilton withdrew $ 20,000 from the Industrial account and deposited it in an account in the name of Construction Specialty of Jefferson, Inc. (herein "Construction Inc.") at the National Bank of Commerce in Jefferson Parish, La. Petitioner had no knowledge of this deposit. On March 5, 1982, petitioner and Mr. Hilton formally incorporated Construction, Inc. Mr. Hilton named petitioner Construction Inc.'s president and made her the majority shareholder. Petitioner never performed any services for or on behalf of Construction, Inc., and never received any compensation therefrom. She was employed full-time with the Chamber of Commerce. Mr. Hilton was Construction, Inc.'s sole "employee." Construction, Inc.' registered *410 office address was La Place Street. However, all bank statements were sent to its office on Josephine Street, New Orleans, La. [12] Mr. Hilton maintained total control over Construction, Inc's. bank accounts, wrote all checks, and made all deposits. Petitioner never saw a bank statement pertaining to this account and was unaware of how much money her husband put into the account. Sometime between January 1, 1982, and April 14, 1982, Mr. Hilton purchased a Magna-van truck in connection with the incorporation of Construction, Inc., financing approximately $ 8,000. Petitioner did not sign the note. Between January 1, 1982, and April 14, 1982, Mr. Hilton withdrew $ 3,325 from the Industrial account and deposited it in the joint Metairie account. [13] *411 Mr. Hilton also withdrew an additional $ 1,775 from Industrial and deposited it in one of the Southern accounts. Between January 1, 1982, and April 14, 1982, petitioner made only three entries on the Metairie register. [14] Mr. Hilton told petitioner to file her Federal income tax return for 1981 as "married filing separate," since filing separate returns reduced their tax liability. Mr. Hilton actually prepared the return and petitioner merely rewrote it and signed it. Petitioner reported her $ 15,377.32 wage income from The Chamber/New Orleans & River Region, signed her return on April 14, 1982, and filed it on or before April 15, 1982. The $ 15,377.32 was the only income petitioner reported. Mr. Hilton also filed a separate return but reported only the $ 20,192.31 in wages he received from T. L. James. Mr. Hilton never told anyone, especially petitioner, of his illegal scheme. Moreover, he never kept any records (i.e., bank statements or invoices) pertaining to Industrial at their La Place Street residence until after August 1982. It was not until November 1982, when two gentlemen from T. L. James came to their *412 La Place Street residence to speak with Mr. Hilton, that petitioner first learned of her husband's illegal activity. In May 1984 all five properties were returned to American Insurance Co. (herein "American") as part of Mr. Hilton's restitution to T. L. James. Mr. Hilton also deeded the La Place Street residence to American. On January 23, 1986, Mr. Hilton was indicted for mail fraud and making a false statement on an income tax return. [15] He pled guilty to all counts. On April 10, 1987, respondent issued petitioner the notice of deficiency at issue in this case. Respondent concedes petitioner satisfies the requirements of section 66(c)(1), i.e., that petitioners did not file a joint return. Petitioner concedes that she failed to properly include one-half of the total wage income she and her husband earned in 1981. [16] OPINION Expiration of Statute of Limitations
The first issue for decision *413 is whether the period of limitations bars respondent's assessment of the deficiency. The parties agree that the general three-year statute of limitations expired [17] for taxable year 1981. Respondent, however, contends that section 6501(e)(1)(A) applies to extend the limitations period to six years. [18]
Respondent has the burden of proving the applicability of the six-year period of limitations and may not rely on the "presumption of correctness" that normally attaches to his notice of deficiency. Reis v. Commissioner, 1 T.C. 9, 12-13 (1942), *414 affd. 142 F.2d 900 (6th Cir. 1944). See Burbage v. Commissioner, 82 T.C. 546, 553 (1984), affd. 774 F.2d 644 (4th Cir. 1985). In order to satisfy his burden, he must show that the taxpayer omitted from gross income an amount in excess of 25 percent of the gross income required to be shown in the return. Sec. 6501(e)(1)(A). See Burbage v. Commissioner, supra; Davenport v. Commissioner, 48 T.C. 921, 928 (1967); Courtney v. Commissioner, 28 T.C. 658, 668 (1957). Accordingly, we must decide whether the misappropriated funds and the interest thereon are properly includable in petitioner's gross income. Louisiana is a community property state. Therefore, we must look to Louisiana law to determine whether the "income" belonged to the community, or whether it was Mr. Hilton's separate property. United States v. Mitchell, 403 U.S. 190, 197 (1971); Sampson v. Commissioner, 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987); Johnson v. Commissioner, 72 T.C. 340, 344 (1979); Estate of Williams v. Commissioner, 62 T.C. 400, 407 (1974). See cf. Aquilino v. United States, 363 U.S. 509, 512-514 (1960); Burnet v. Harmel, 287 U.S. 103 (1932). Generally, a spouse *415 residing in a community property state has a vested interest in and is owner of one-half of all of both spouses' community income, and is generally liable for the Federal income tax on one-half thereof.[19]United States v. Mitchell, 403 U.S. at 196; [20] *416 Bender v. Pfaff, 282 U.S. 127 (1930); La. Civ. Code Ann. art. 2363 (West 1985). See Bagur v. Commissioner, 603 F.2d 491, 498 (5th Cir. 1979), remanding 66 T.C. 817 (1976). [21] This is true regardless of whether the spouse actually "received" or "enjoyed" her share of the income. Cf. Kimes v. Commissioner, 55 T.C. 774, 782 (1971). Louisiana law defines community property as "property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse;" and all other property not classified by law as separate property. La. Civ. Code Ann. art. 2338 (West 1985). Although there is a presumption that all property "acquired" or "possessed" during the marital community is community property, this presumption may be overcome upon proper proof. La. Civ. Code Ann. arts. 2338 and 2340 (West 1985); Bridges v. Osborne, 525 So.2d 337 (La. Ct. App. 1988), writ denied 530 So.2d 567 (La. 1988). Petitioner and Mr. Hilton were not parties to a matrimonial agreement excluding the community property regime. Furthermore, there was not a judgment decreeing a separation of their property. A. Misappropriated Funds
If the misappropriated funds constitute community property, then one-half is properly includable in petitioner's income and *417 taxable to her even though she had no part in its acquisition. [22] Otherwise, petitioner is not liable for the tax on one-half, since she has no ownership interest therein. See Crawford v. Commissioner, T.C. Memo. 1961-224; La. Civ. Code Ann. art. 2338 (West 1985). Petitioner alleges that she did not acquire a vested interest in one-half of the funds because her husband never acquired title to them. Thus, the funds did not constitute community income and, therefore, are not properly includable in her income for purposes of section 6501(e)(1)(A) or section 66.[23] *419 On the other hand, respondent contends that the misappropriated funds are presumed to constitute community property under La. Civ. Code Ann. art. 2340 (West 1985). [24] Additionally, he contends that since *418 T. L. James intended to pass both possession and title to Mr. Hilton, the funds constitute community property. See Johnson v. Commissioner, 72 T.C. 340 (1979). We disagree with respondent's contentions. Although we have not found a Louisiana Supreme Court case interpreting the term "acquired," we believe Louisiana, like Texas, [25] would follow the "ownership" or "title" rule. See Johnson v. Commissioner, supra.Cf. Cosey v. Cosey, 376 So.2d 486 (La. 1979) (for real property to be classified as community property there must be an act of sale transferring title). Therefore, we believe that, as a general principle, property is not "acquired" within the meaning of Louisiana's community property law until the spouse making the acquisition acquires some legal title thereto. See Wrightsman v. Commissioner, 111 F.2d 227, 228 (5th Cir. 1940), affg. 40 B.T.A. 502 (1939). Accordingly, if a spouse acquires possession of property without title, the property remains the separate property of the *420 spouse who has possession, and for Federal tax purposes, is properly taxed to the person who has "control." Wrightsman v. Commissioner, supra.See Corliss v. Bowers, 281 U.S. 376 (1930); Grimm v. Commissioner, 89 T.C. 747, 753 (1987), affd. 894 F.2d 1165 (10th Cir. 1990). Our decision, therefore, turns on whether Mr. Hilton acquired title to the misappropriated funds. La. Rev. Stat. Ann. sec. 14:67 (West 1986) defines "theft" as the "misappropriation or taking of anything of value which belongs to another * * * by means of fraudulent conduct, practices, or representations." Where property is acquired by theft, whether title to such property passes depends on whether the owner intended to pass both possession and title to the illegal taker. See Johnson v. Commissioner, supra; Wrightsman v. Commissioner, supra.It is clear that T. L. James did not intend to pass title to Mr. Hilton, but rather to Industrial, the fictitious company. Accordingly, we find that, under Louisiana law, like that of Texas, title to the misappropriated funds did not pass to Mr. Hilton. Succession of Onorato, 219 La. 1, 51 So.2d 804 (1951). *421 See Wrightsman v. Commissioner, supra.
Since Mr. Hilton did not acquire title to the misappropriated funds, a fortiori, the funds were not "acquired" for purposes of vesting a one-half interest in petitioner. See Johnson v. Commissioner, supra.
Based on the foregoing, we conclude that the $ 87,674.16 (one-half of the misappropriated funds) is not properly includable in petitioner's gross income. Sec. 6501(e)1)(A). See Sec. 66(c)(2). B. Interest Income
Respondent contends that the natural and civil fruits of separate property of a spouse are community property. See La. Civ. Code Ann. arts. 2338 and 2339 (West 1985). On the other hand, petitioner alleges that since the interest was earned from the misappropriated funds, then it should be considered the separate property of Mr. Hilton and not "properly includable" in petitioner's gross income. We agree with respondent. Petitioner's name appeared on the Form 1090 and on the bank's statements indicating that $ 2,969.24 interest was earned during 1981. Petitioner failed to go forward with additional evidence to rebut respondent's contention, and failed to convince this Court that the interest earned on the Southern accounts was other *422 than community income. Therefore, we find the interest earned on the Southern accounts constitutes community income. See Poole v. Poole, 270 So.2d 218 (La. Ct. App. 1972); La. Civ. Code Ann. arts. 2338 and 2339 (West 1985). We hold that one-half of the interest income, or $ 1,484.62, was properly includable in petitioner's separate return. Sec. 6501(e)(1)(A). Based on the foregoing, petitioner omitted $ 3,892.11, i.e., $ 2,407.49 of additional wage income and $ 1,484.62 of interest income, which is in excess of 25 percent of $ 15,377.32, or $ 3,844.33, the amount stated in her return. Accordingly, the six-year period of limitations under section 6501(e)(1)(A) applies. Section 66(c)
We must next determine whether petitioner qualifies for relief under section 66(c). Petitioner bears the burden of proof. Rule 142(a). The purpose of section 66(c) is to provide relief from unreported community income which, pursuant to the rules of section 879(a), is more appropriately attributable to the other spouse. To qualify under section 66(c) petitioner must satisfy all four of the following conditions: (1) she must not have filed a joint return with Mr. Hilton for 1981, (2) she must not have *423 included in her gross income for 1981 an item of community income properly includable therein which, in accordance with the rules contained in section 879(a), would be treated as the income of Mr. Hilton, (3) she must establish that she did not know, and had no reason to know, of the item of community income, and, (4) taking into account all facts and circumstances, it is inequitable to include such item of community income in her gross income.
If all four of these prerequisites are satisfied, then the item of unreported community income is includable in the income of the other spouse. Respondent concedes petitioner has satisfied the first prerequisite. Additionally, the first part of the second requirement is also satisfied, since petitioner failed to include two items of community income that were properly includable on her 1981 separate return; i.e., one-half of the interest income (community income) and one-half of the total community wage income. A. Section 66(c)(2), second part
Section 879(a) attributes (1) "earned income" to the spouse who performed the services [sec. 897(a)(1)], (2) trade or business income in accordance with section 1402(a)(5) [sec. 879(a)(2)], (3) community *424 income not described in either (1) or (2) which is derived from the spouse's separate property, to such spouse [sec. 879(a)(3)], and (4) all other community income in accordance with the applicable community property law [sec. 879(a)(4)]. We have already found that the misappropriated funds were the "separate property" of Mr. Hilton, a fortiori, the interest earned from those funds falls within section 879(a)(3). We therefore, conclude that the interest income is properly attributable to Mr. Hilton, not petitioner. Additionally, the $ 2,407.49 community wage income petitioner failed to report is likewise attributable to Mr. Hilton in accordance with section 879(a)(1). B. Section 66(c)(3)
In our opinion, this prerequisite for relief has been satisfied with respect to the interest income. It is clear that petitioner neither knew of, nor had reason to know of Industrial's existence, the misappropriated funds, the Southern accounts, or the interest earned thereon. However, with respect to the wage income, we find that petitioner knew her husband had "earned income." Thus, we find that section 66(c)(3) is not satisfied as to the $ 2,047.49, and petitioner remains liable for the taxes *425 thereon. C. Section 66(c)(4)
Lastly, in accordance with the fourth prerequisite, we believe that under all the circumstances, it would be inequitable to include the interest income in petitioner's income. There is no evidence that petitioner ever "benefited," significantly or otherwise, from this interest income. Additions to tax
The last issue for decision is whether petitioner is liable for negligence and additional interest under section 6653(a)(1) and (2). Under the circumstances, we find petitioner was not negligent and is, therefore, not liable for the additions to tax. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on $ 53,957.99.↩
1. Mr. Hilton's parents (herein the "Hiltons") owned a large home on White Street in old Metairie, a wealthy neighborhood, and gave their children expensive gifts, such as cars for high school graduation. Petitioner equated the Hiltons' lifestyle as being normal for Mr. Hilton. Additionally, petitioner realized that the Hiltons were always available to help their children, financially and otherwise, including Mr. Hilton.↩
2. He told petitioner before they were married that T. L. James would occasionally pay him a "finder's fee" if he located specified equipment for it. Although that was not true, petitioner had no reason not to believe him.↩
3. Mr. Hilton had been married once before and was paying $ 450 per month ($ 5,400 per year) in alimony and child support.
4. She also closed her checking account. Petitioner did not, however, use her checking account daily. She apparently had minor expenses. For example, when she used her mother's credit card to buy something for herself, she would reimburse her mother by writing a check from her account. Additionally, she would pay her parking expense out of her checking account.↩
5. The account with Commercial remained open until November 16, 1981.↩
6. ↩
Checks written in 1981 by petitioner: Commercial account
Check No.
Date
Payee
Amount
355
1/01
Lorraine Ortego
$ 450.00
356
1/16
Robert Ealie
58.21
357
1/16
Northwestern Mutual Life
59.31
358
1/16
La. Gas Service Co.
39.02
359
1/16
La. Power & Light
35.82
360
1/16
South Central Bell
21.26
361
1/17
Cox Cable TV
31.00
362
1/16
Citibank MasterCard
11.55
363
1/16
American Express
111.54
$ 817.71
7. The Southern account numbers are 19-04-095108-9, 13-04-025579-9, 13-04-025652-4, and 13-04-024954-5.↩
8. Petitioner did not drive the new car regularly; instead she drove Mr. Hilton's 1977 Pontiac.↩
9. They did not plan to build on the property until after they paid off the loan.↩
10. Mr. Hilton did not misappropriate any funds from T. L. James from the time he was laid off in October through December 31, 1981.↩
11. Deposits from Industrial to Metairie (364-020-5)
Check No.
Date
Payee
Amount
790
5/21/81 CASH
$ 28,500
794
7/08/81 CASH
900
808
10/14/81
CASH
100
820
12/22/81
ALBERT HILTON
500
$ 30,000
↩
Deposits from Industrial to Southern
Check No.
Date
Payee
Amount
817
11/30/81
SOUTHERN
$ 40,000
12. Mr. Hilton rented a 4,000 square foot warehouse on Josephine Street from a friend, paying $ 400 per month rent. By August 1982 Mr. Hilton decided to move Construction Inc.'s office to his La Place Street residence in order to avoid the $ 400 monthly outlay.↩
13. During 1982 Mr. Hilton withdrew a total of $ 8,945 from Industrial's checking account and deposited it in the Metairie account.
14. ↩
Check Register for Metairie
Check No.
Date
Payee
Amount
257
3/15/82
YMCA
$ 25.00 271
4/10/82
You Boutique
64.53
272
4/14/82
IRS
556.42
15. Count 3 charged Mr. Hilton with violation of 26 U.S.C. sec. 7206(1)↩.
16. Petitioner reported $ 15,377.32 in wage income, rather than $ 17,784.81 calculated as follows:
↩
50 percent of her wage income $ 15,377.32 =
$ 7,688.66
50 percent of her husband's wage income 20,192.31 =
10,096.15 35,569.63 $ 17,784.81
17. Section 6501(a) provides, in pertinent part, as follows: SEC. 6501(a)↩. GENERAL RULE. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.
18. Under section 6501(e)(1)(A)↩, if the taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return then respondent has six years to assess the tax.
19. The wife is not only vested with the ownership of half of the community property from the moment it is acquired, but is likewise the owner of half of the community income. Bender v. Pfaff, 282 U.S. 127 (1930); cf. T. L. James & Co. v. Montgomery, 332 So.2d 834, 843 (La. 1975). See also Succession of Wiener, 203 La. 649, 14 So.2d 475↩ (1943).
20. In United States v. Mitchell, 403 U.S. 190, 197 (1971), the Supreme Court stated: with respect to community income, as with respect to other income, federal income tax liability follows ownership. [citations omitted] In the determination of ownership, state law controls. "The state law creates legal interests but the federal statute determines when and how they shall be taxed." [Citations omitted.]
21. See also Poe v. Seaborn, 282 U.S. 101 (1930); Goodell v. Koch, 282 U.S. 118 (1930); Hopkins v. Bacon, 282 U.S. 122, 126↩ (1930).
22. It is well settled law that income earned illegally is income under section 61, and therefore taxable. James v. United States, 366 U.S. 213, 219 (1961). See also Galliher v. Commissioner, 62 T.C. 760, 764 (1974), affd. without published opinion 512 F.2d 1404 (5th Cir. 1975), cert. denied 423 U.S. 988 (1975); McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967↩ (1976).
23. Section 66(c) is a liability relief provision for "innocent" spouses in community property states. If an item of income is "community property," section 66(c) may apply to exclude that item of community income from the innocent spouse's income. Section 66(c) provides: (c) SPOUSE RELIEVED OF LIABILITY IN CERTAIN OTHER CASES. -- Under regulations prescribed by the Secretary, if -- (1) an individual does not file a joint return for any taxable year, (2) such individual does not include in gross income for such taxable year an item of community income properly includible therein which, in accordance with the rules contained in section 879(a), would be treated as the income of the other spouse, (3) the individual establishes that he or she did not know of, and had no reason to know of, such item of community income, and (4) taking into account all facts and circumstances, it is inequitable to include such item of community income in such individual's gross income, then, for purposes of this title, such item of community income shall be included in the gross income of the other spouse (and not in the gross income of the individual).
24. La. Civ. Code Ann. art. 2340 (West 1985) provides: Things in the possession of a spouse during the existence of a regime of the community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property.↩
25. Poe v. Seaborn, 282 U.S. 101 (1930); Hopkins v. Bacon, 282 U.S. 122↩ (1930).